Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/22/2019 01:08 PM CDT

STEPHANIE A. SPARKS, PERSONAL REPRESENTATIVE OF
THE ESTATE OF GARY W. ISOM, DECEASED, ET AL.,
APPELLANTS AND CROSS-APPELLEES, V.
M&D TRUCKING, L.L.C., APPELLEE
AND CROSS-APPELLANT.

___ N.W.2d ___

Filed December 28, 2018.    No. S-17-1209.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

2. **____: ____.** In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.

3. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.

4. **Summary Judgment.** On a motion for summary judgment, the question is not how a factual issue is to be decided, but whether any real issue of material fact exists.

5. **Employer and Employee: Independent Contractor: Master and Servant.** Ordinarily, a party's status as an employee or an independent contractor is a question of fact. However, where the facts are not in dispute and where the inference is clear that there is, or is not, a master and servant relationship, the matter is a question of law.

6. **Contracts: Parties: Words and Phrases.** By stating "where the inference is clear," the Nebraska Supreme Court means that there can be no dispute as to pertinent facts pertaining to the contract and the relationship of the parties involved and only one reasonable inference can be drawn therefrom.

7. **Employer and Employee: Independent Contractor.** A determination of a party's status as an employee or an independent contractor is determined from all the facts in the case and depends on the facts underlying the relationship of the parties irrespective of the words or terminology used by the parties.

8. ____: ____. No single test exists for determining whether one performs services for another as an employee or as an independent contractor, and the following 10 factors must be considered: (1) the extent of control which, by the agreement, the potential employer may exercise over the details of the work; (2) whether the one potentially employed is engaged in a distinct occupation or business; (3) the type of occupation, with reference to whether, in the locality, the work is usually done under the direction of the potential employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the potential employer or the one potentially employed supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the one potentially employed is engaged; (7) the method of payment, whether by the time or by the job; (8) whether the work is part of the regular business of the potential employer; (9) whether the parties believe they are creating an agency relationship; and (10) whether the potential employer is or is not in business.

9. ____: ____. The extent of control is the chief factor distinguishing an employment relationship from that of an independent contractor.

10. ____: ____. In examining the extent of a potential employer's control over the worker, it is important to distinguish control over the means and methods of the assignment from control over the end product of the work to be performed.

11. **Independent Contractor: Words and Phrases.** An independent contractor is one who, in the course of an independent occupation or employment, undertakes work subject to the will or control of the person for whom the work is done only as to the result of the work and not as to the means or methods used.

12. **Independent Contractor: Contracts.** Even the party contracting with an independent contractor may, without changing the status, exercise such control as is necessary to assure performance of the contract in accordance with its terms.

13. **Negligence: Liability: Contractors and Subcontractors.** Generally, one who employs an independent contractor is not liable for physical harm caused to another by the acts or omissions of the contractor or its servants.

14. ____: ____: ____. A party contracting with an independent contractor can be liable for physical harm caused to another if (1) the contracting

party retains control over the contractor's work, (2) the contracting party is in possession and control of premises, (3) a statute or rule imposes a specific duty on the contracting party, or (4) the contractor's work involves special risks or dangers. Courts often refer to the latter three exceptions as involving nondelegable duties.

15. **Negligence: Liability: Contractors and Subcontractors: Words and Phrases.** A nondelegable duty means that a contracting party to an independent contractor, by assigning work consequent to a duty, is not relieved from liability arising from the delegated duties negligently performed.

16. **Contractors and Subcontractors: Liability.** To fall within the control exception to the general rule of nonliability, the contracting party's involvement in overseeing the work must be substantial.

17. \_\_\_\_: \_\_\_\_. To fall within the control exception to the general rule of nonliability, control must directly relate to the work that caused the injury.

18. \_\_\_\_: \_\_\_\_. The key element of control must exist with respect to the very thing from which the injury arose.

19. \_\_\_\_: \_\_\_\_. To impose liability, the contracting party must have (1) supervised the work that caused the injury, (2) actual or constructive knowledge of the danger that ultimately caused the injury, and (3) the opportunity to prevent the injury.

20. **Negligence: Contractors and Subcontractors.** Having the right to control and supervise the work implies having the ability to oversee and direct the manner in which the work which caused the injury is carried out.

21. **Federal Acts: Motor Carriers: Judgments: Proof.** The federal Motor Carrier Safety Improvement Act of 1999 and the Federal Motor Carrier Safety Regulations generally require that a commercial motor carrier operate only if registered and that such registration requires proof of financial responsibility in order to ensure collectability of a judgment against the motor carrier.

22. **Federal Acts: Motor Carriers: Intent.** The federal Motor Carrier Safety Improvement Act of 1999 and the Federal Motor Carrier Safety Regulations protect the public and provide financial responsibility for motor carrier accidents by creating a legal right and a duty to control vehicles operated for the regulated motor carrier's benefit.

23. **Motor Carriers: Brokers: Liability.** When distinguishing between a motor carrier and a broker, the determinative question is whether the disputed party accepted legal responsibility to transport the shipment.

24. **Motor Carriers: Brokers.** A transportation company may have authority to act as a shipper, broker, or carrier, and a court must focus on the

specific transaction at issue—not on whether the transportation company acts as a motor carrier in other transactions.

25. **Negligence: Liability: Employer and Employee: Independent Contractor.** An employer is subject to liability for physical harm to third persons caused by the employer's failure to exercise reasonable care in selecting an employee, even if such employee is an independent contractor.

26. **Federal Acts: Motor Carriers: Records.** The federal Motor Carrier Safety Improvement Act of 1999 and the Federal Motor Carrier Safety Regulations require motor carriers to obtain and maintain records on each of the drivers they employ, such as driving and medical records.

Appeal from the District Court for Douglas County: TIMOTHY P. BURNS, Judge. Affirmed.

Patrick R. Turner, Steven G. Emerson, Thomas H. Davis, and Bradley J. Yeretsky, of Stinson, Leonard & Street, L.L.P., for appellants.

Thomas A. Grennan and Adam J. Wachal, of Gross & Welch, P.C., L.L.O., for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG JJ.

FUNKE, J.

Stephanie A. Sparks, as personal representative of the estate of Gary W. Isom and as temporary guardian of Justin W. Isom; Melanie Crosby, as personal representative of the estate of Tiffany R. Isom; and Nancy Ragains, as personal representative of the estate of Susan G. Isom (appellants), appeal the district court's order granting the motion for summary judgment of M&D Trucking, L.L.C. (M&D). M&D cross-appeals. For the reasons set forth herein, we affirm.

## I. BACKGROUND

### 1. FACTS

Around 5 a.m. on August 28, 2014, Kenneth Bryan Johnson was driving a truck and trailer and failed to stop at a stop sign,

striking a vehicle carrying members of the Isom family: Gary, Susan, their son Justin, and Gary's adult daughter Tiffany. Gary, Susan, and Tiffany died as a result of the collision, and Justin was seriously injured. Johnson had been driving longer than permitted under applicable law, and Johnson had consumed alcohol less than 4 hours before going on service. Johnson had a criminal history relating to the operation of motor vehicles, including driving on a suspended license, driving without a license, and driving under the influence of alcohol.

Johnson contracted with Turbo Turtle Logistics LLC (Turbo Turtle) and was driving a truck and trailer with Turbo Turtle signage on the date of the accident. According to deposition testimony from Turbo Turtle president Robert Brackett, Turbo Turtle is a logistics and brokerage company; logistics meaning the physical transportation of products, and brokerage meaning the arranging of transportation of freight by others. At the time of the accident, Turbo Turtle was a motor carrier. At all relevant times, Brackett testified that he was the only employee of Turbo Turtle and that the drivers were independent contractors. Brackett explained Johnson had been one of Turbo Turtle's independent contractor drivers approximately 30 days prior to the accident and that he leased a truck and trailer from Turbo Turtle during that time. Johnson was not allowed to use Turbo Turtle's equipment for any work that was not dispatched through Turbo Turtle or M&D, the company which was hired to transport the load Johnson carried during the accident.

Turbo Turtle had had a business relationship with M&D since Turbo Turtle's creation in 2012. Brackett testified that Turbo Turtle got involved with M&D because Turbo Turtle was trying to add trucks and did not have time to look for work. Brackett opined that, likely, M&D worked with Turbo Turtle to add to its capacity in using Turbo Turtle's drivers, trucks, and trailers. From its inception until the end of its relationship with M&D, Brackett explained that about 98 percent of Turbo Turtle's work came from M&D.

M&D operates as a brokerage and trucking company. M&D did not have an ownership interest in Turbo Turtle. At the time of the accident, Michael Plambeck was the manager and Dan Rudnick assisted. According to Plambeck, through its trucking division, M&D employed four to five drivers who drove trucks and trailers owned by M&D. Through its brokerage division, M&D got orders from customers and then sent the load information out to M&D drivers or other carriers. According to Rudnick, M&D's customers did not know which loads would be assigned to M&D drivers and which would be assigned to other carriers. The customers would be billed the same amount regardless of which type of driver was used. While not separate companies, M&D had separate licensing for its brokerage and trucking services and separate insurance plans.

M&D and Turbo Turtle signed a contract detailing the relationship between the companies titled "Contract for Dispatch Services at Reduced Rate With Mutual Non-Competition Upon Early Termination by Either Party." The contract provided that M&D would be the exclusive dispatch servicer for Turbo Turtle with an exception for summer and fall harvesttime in South Dakota. As to Turbo Turtle's drivers, the contract stated, "[Turbo Turtle] will assure that at least 42 weeks of the yearly hauling in total for all of the [independent contractors] under contract with [Turbo Turtle] results from M&D dispatch services"; "[Turbo Turtle] will maintain at least one [independent contractor] under dispatch by M&D at all times"; and "this contract does not require the dedication by [Turbo Turtle] of a particular [independent contractor] to dispatch by M&D." It additionally applied a 2-year, noncompetition agreement should the parties prematurely break the contract. By operation of this contract, Brackett claimed M&D was leasing his four Turbo Turtle trucks. Plambeck, in turn, asserted that any drivers arranged through Turbo Turtle were Turbo Turtle employees or contractors and, as such, M&D never conducted background checks, criminal history background checks, review of a driver's driving record or traffic violations, or

review of the performance of Turbo Turtle's drivers. Instead, Plambeck testified, M&D requested and received from Turbo Turtle various legal forms necessary for work between a broker and carrier, including a "DOT motor carrier number" saying Turbo Turtle is legally allowed to haul freight, insurance verification, and W-9 forms for tax purposes. Brackett alleged the contract between M&D and Turbo Turtle was in effect at the time of the accident. Plambeck claimed that M&D terminated the contract on August 28, 2014, once they became aware that Turbo Turtle hauled a load for a different company, while Brackett opined that the contract was terminated in connection with the accident.

Brackett, Plambeck, and Rudnick explained the general procedure between M&D and Turbo Turtle for assigning and transporting hired loads. Plambeck described that a customer would communicate the details of a load to M&D; M&D would document the information on a "load sheet" with the load number, pickup location, destination, telephone numbers, and load quantity; M&D would communicate to Turbo Turtle or a specific driver the load information; and the driver would receive a paper at the pickup and destination and that paper would be sent to M&D for billing purposes. Brackett explained M&D would communicate the load information to Turbo Turtle by sending the individual drivers text messages and Turbo Turtle a copy of those messages. According to Brackett, Turbo Turtle would have no knowledge of who the actual customers were. For payment on loads carried by Turbo Turtle drivers, M&D would charge the customer the same amount as it would have if it used its own driver, M&D would keep a percentage of the total and pay the rest to Turbo Turtle, and Turbo Turtle would keep a percentage of the amount provided by M&D and pay the rest to the driver.

Specifically, on the facts surrounding the accident at issue, M&D had a telephone conversation with Northern Ag Service, Inc., now known as NORAG LLC (Northern Ag), about picking up fracking sand from Genoa, Nebraska, to transport to

Blackwell, Oklahoma. Northern Ag is a freight broker, meaning vendors call Northern Ag about moving various loads and Northern Ag then matches the vendor with a carrier or, sometimes, with another broker who contacts another carrier. M&D did not tell Northern Ag which of the ordered loads would be handled by M&D and which would be handled by outside drivers.

Plambeck testified that Northern Ag was fully aware that M&D was a brokerage and trucking company and that it used its own company drivers as well as drivers from other companies to haul loads for Northern Ag. However, there was no written contract in place detailing the relationship between M&D and Northern Ag, and a manager for Northern Ag testified during a deposition that M&D never informed Northern Ag that it was working with outside drivers. He explained that he believed Northern Ag thought it was dealing only with M&D, not knowing Turbo Turtle was handling some of its loads, and that Northern Ag hired M&D to be the carrier. In various records of pickup and destination locations created by Northern Ag for its use, Northern Ag repeatedly listed M&D as the carrier. In the origin ticket/origin bill of lading created by Northern Ag for the load carried during the accident, M&D was listed as the carrier on the pickup.

On August 27 and 28, 2014, M&D, Turbo Turtle, and Johnson had various cell phone communications. Plambeck testified that around 11 p.m., someone from M&D text messaged either Turbo Turtle or Johnson about carrying one of the Northern Ag loads. Rudnick explained that he had contact with either Turbo Turtle or Johnson that night, because a load number did not work and Rudnick had to provide a new number. Plambeck testified Johnson was not required to call M&D once he picked up the load. From information obtained from Johnson's cell phone, the following communications occurred:
• At 9:01 a.m. on August 27, 2014, M&D text messaged Johnson and canceled a load that he was carrying for M&D due to rain.

- Approximately 30 minutes later, M&D text messaged Johnson and dispatched him and his truck to transport a load of sand from Genoa, Nebraska, to Waterford City, North Dakota.
- At 10:47 a.m., Johnson made a short telephone call to M&D.
- At 10:53 a.m., Johnson text messaged Turbo Turtle and informed it that M&D had dispatched him on a load from Genoa to Waterford City.
- At 11:43 p.m., Johnson received a text message from Turbo Turtle stating, "Genoa, NE Sand to Blackwell, OK."
- At 12:09 a.m. on August 28, 2014, Johnson received a telephone call from M&D lasting approximately 1 minute 41 seconds.
- At 12:41 a.m., Johnson received a telephone call from M&D lasting approximately 8 minutes 41 seconds.
- From 12:54 a.m. to 12:58 a.m., Johnson and Turbo Turtle exchanged six text messages, including discussions about truckstops available en route to Blackwell.

The accident between the Isom family and Johnson occurred around 5 a.m. on August 28, 2014. A police report from the accident listed Turbo Turtle as the motor carrier.

## 2. Appellants' Claims

Appellants brought the instant action against Turbo Turtle, Johnson, and M&D. Pursuant to a stipulation and joint motion, the court dismissed the claims against Turbo Turtle and Johnson. On the claims against M&D, the stipulation and motion to dismiss provided: "This Dismissal does not involve any other defendant or potential tortfeasor. The Plaintiffs reserve all claims against M&D . . . and the claims against it remain pending and are not dismissed." The order dismissing the claims against Turbo Turtle and Johnson confirmed: "This Dismissal does not extend to M&D . . . . The Plaintiffs' claims against M&D [remain] pending . . . ."

As to M&D, appellants alleged that (1) Johnson was an agent of M&D, and M&D was liable for his negligence through the doctrine of respondeat superior; (2) M&D was negligent in hiring, training, or supervising Johnson given Johnson's unfitness

to operate motor vehicles on public roads and a criminal history regarding the operation of motor vehicles; and (3) M&D was negligent per se in that M&D was the operator and/or statutory lessee of the truck and trailer driven by Johnson under the federal Motor Carrier Safety Improvement Act of 1999 (FMCSA) and Federal Motor Carrier Safety Regulations (FMCSR) and, thus, liable for Johnson's and its own negligence.

### 3. SUMMARY JUDGMENT

M&D filed a motion for summary judgment claiming there was no genuine issue of material fact and that M&D was entitled to summary judgment as a matter of law. In support of the motion, M&D asserted Johnson was not an employee of M&D, Johnson was an independent contractor of Turbo Turtle who was in turn an independent contractor of M&D, and M&D did not have sufficient control over Johnson to be vicariously liable.

Following a hearing on the motion, the district court granted M&D summary judgment as to all three claims. On the claim of respondeat superior, the court first determined appellants' claim is not barred by the prior settlement with Turbo Turtle and Johnson through operation of Neb. Rev. Stat. § 25-21,185.11(1) (Reissue 2016) ("[a] release, covenant not to sue, or similar agreement entered into by a claimant and a person liable shall discharge that person from all liability to the claimant but shall not discharge any other persons liable upon the same claim unless it so provides"). The court then determined that Johnson was not an employee of M&D and that M&D did not exert sufficient control over Johnson to establish appellants' claim of respondeat superior. On the claim of negligent hiring, training, or supervising, the court determined M&D complied with its reasonable duty of care as a broker in that the record did not support a finding that M&D knew or should have known Turbo Turtle had an inadequate safety record or that Turbo Turtle hired an unsafe driver in Johnson. Finally, the court noted that negligence per se is not recognized as a separate cause of action in Nebraska for a violation of FMCSA and FMCSR.

## II. ASSIGNMENTS OF ERROR

Appellants assign, restated, that the district court erred in granting summary judgment, because there was a genuine issue of material fact of (1) whether M&D was Johnson's common-law or statutory employer and (2) whether M&D negligently hired, trained, or supervised Johnson.

On cross-appeal, M&D assigns, restated, that the district court erred in finding that appellants' decision to settle with Turbo Turtle and Johnson does not operate as a release of M&D in the event that Turbo Turtle or Johnson are deemed agents of M&D.

## III. STANDARD OF REVIEW

[1-3] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[1] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.[2] Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.[3]

## IV. ANALYSIS

### 1. Employee Versus Independent Contractor

Appellants first assign the district court erred in its determination that Johnson was an independent contractor and not M&D's employee. Appellants claim there is substantial

---

[1] *Estermann v. Bose*, 296 Neb. 228, 892 N.W.2d 857 (2017).

[2] *Id.*

[3] *Id.*

evidence that M&D controlled Johnson's work, as well as other relevant factors to create a question of fact as to whether M&D was Johnson's common-law employer.

[4-6] On a motion for summary judgment, the question is not how a factual issue is to be decided, but whether any real issue of material fact exists.[4] Ordinarily, a party's status as an employee or an independent contractor is a question of fact.[5] However, where the facts are not in dispute and where the inference is clear that there is, or is not, a master and servant relationship, the matter is a question of law.[6] By stating "where the inference is clear," this court means that there can be no dispute as to pertinent facts pertaining to the contract and the relationship of the parties involved and only one reasonable inference can be drawn therefrom.[7]

In this matter, the material facts are not in dispute. Rather, the parties argue about the inferences to be drawn from those facts concerning the legal relationships of the parties. We determine these inferences are clear and can be determined as a matter of law.

[7,8] A determination of whether Johnson was M&D's employee or an independent contractor is determined from all the facts in the case and depends on the facts underlying the relationship of the parties irrespective of the words or terminology used by the parties.[8] No single test exists for determining whether one performs services for another as an employee or as an independent contractor, and the following 10 factors must be considered: (1) the extent of control which, by the agreement, the potential employer may exercise over the details of the work; (2) whether the one potentially employed is engaged in a distinct occupation or business; (3) the type of

---

[4] *Kime v. Hobbs*, 252 Neb. 407, 562 N.W.2d 705 (1997).

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] See *id.*

occupation, with reference to whether, in the locality, the work is usually done under the direction of the potential employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the potential employer or the one potentially employed supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the one potentially employed is engaged; (7) the method of payment, whether by the time or by the job; (8) whether the work is part of the regular business of the potential employer; (9) whether the parties believe they are creating an agency relationship; and (10) whether the potential employer is or is not in business.[9]

### (a) Extent of Control

[9-12] The extent of control is the chief factor distinguishing an employment relationship from that of an independent contractor.[10] In examining the extent of the potential employer's control over the worker in this context, it is important to distinguish control over the means and methods of the assignment from control over the end product of the work to be performed.[11] An independent contractor is one who, in the course of an independent occupation or employment, undertakes work subject to the will or control of the person for whom the work is done only as to the result of the work and not as to the means or methods used.[12] Even the party contracting with an independent contractor may, without changing the status, exercise such control as is necessary to assure performance of the contract in accordance with its terms.[13]

Appellants contend several facts support a finding that M&D exerted sufficient control over Johnson for a determination that

---

[9] See *Mays v. Midnite Dreams*, 300 Neb. 485, 915 N.W.2d 71 (2018).

[10] See *Kime, supra* note 4.

[11] *Id.*

[12] *Id.*

[13] See *id.*

the relationship went beyond that of an independent contractor to an employer-employee. Specifically, appellants point to the text messages and cell phone calls between M&D, Turbo Turtle, and Johnson representatives on August 27 and 28, 2014; the contract between M&D and Turbo Turtle which provided M&D would be the exclusive dispatch servicer for Turbo Turtle; and the agreement between Turbo Turtle and Johnson that Johnson could not drive the leased equipment for loads outside those for M&D and Turbo Turtle.

However, these factual allegations do not lead to a determination that M&D and Johnson's relationship went beyond that of an independent contractor. The text messages cited by appellants show that M&D canceled a load due to rain at 9:01 a.m. on August 27, 2014; that M&D provided Johnson load information for a different load to North Dakota 30 minutes later; and that Turbo Turtle provided load information to Johnson about the Northern Ag load at 11:43 p.m. By providing only the pickup and destination locations, these messages go to the result of the work and not the means or methods used.[14] Additionally, the fact that M&D text messaged Johnson the North Dakota load information directly rather than Turbo Turtle is not at odds with an independent contractor relationship. M&D and Turbo Turtle had a history of M&D's making direct communications with Turbo Turtle's drivers; Turbo Turtle was informed of the North Dakota load by Johnson; and M&D communicated with Turbo Turtle directly about the Northern Ag load, which Turbo Turtle then communicated to Johnson. Through the text messages, the record demonstrates only that M&D was controlling Johnson as to the end product of the work to be performed and did so pursuant to its agreement with Turbo Turtle.

The cell phone calls also do not provide sufficient support that M&D controlled Johnson's actions as to the means and methods to be used. Appellants argue the timing of these calls

---

[14] See *id*.

implies M&D was directing Johnson on the routes to take or the means in which to haul the load, because they occurred after he had the load information, but there is no evidence in the record as to the subject or content of the cell phone calls. Instead, the only information available about the content of the calls is from M&D representatives who testified that, while they do not remember the content of these specific calls, they contacted Johnson only concerning load information. Additionally, it is not a clear inference from the timing of these calls that they were instructing Johnson on the routes to take or the means to haul the load. These cell phone calls occurred relatively soon after Turbo Turtle text messaged Johnson the Northern Ag load information which could imply the conversations were merely communications expanding on the load information. The conversations could also have been concerning the status of other loads or a variety of other topics. Without further evidence on the subject of the calls, there is no clear implication that, as appellants suggest, the calls were M&D's instructing Johnson on the means or methods in which to drive the load.

As to the contract between M&D and Turbo Turtle and the agreement between Turbo Turtle and Johnson, appellants argue these agreements lead to the conclusion that Johnson was permitted to drive only M&D's loads, which was evidence that M&D exercised control over Johnson under an employer-employee relationship. However, the record does not lead to such conclusion. Johnson never contracted with M&D; instead, Turbo Turtle contracted with M&D and Turbo Turtle contracted with Johnson. According to the contract between M&D and Turbo Turtle, M&D was to provide exclusive dispatch services to Turbo Turtle with an exception for periods in which Turbo Turtle was carrying loads related to harvesttime. While the contract required at least one of Turbo Turtle's drivers be available for dispatch by M&D, the contract stated that it did not "require the dedication by [Turbo Turtle] of a particular [independent contractor] to dispatch by M&D." Johnson's

agreement with Turbo Turtle, in turn, provided that Johnson could not drive Turbo Turtle's equipment for any load other than those issued by Turbo Turtle or M&D but did not prevent Johnson from using other equipment to carry outside loads. There is also nothing in the record that the agreement prohibited Johnson from carrying loads for Turbo Turtle that were unrelated to M&D, and Turbo Turtle was permitted under the M&D contract to assign non-M&D loads during harvesttime. Therefore, appellants' contention that Johnson could carry only M&D loads is refuted by the record.

In consideration of all of the above and in review of the record, there is insufficient evidence to create a genuine issue of material fact that M&D exerted the extent of control necessary over Johnson for a determination that the relationship went beyond that of an independent contractor to an employer-employee.

### (b) Other Factors

Appellants contend additional factors weigh toward a determination that Johnson and M&D had an employer-employee relationship: whether the one potentially employed is engaged in a distinct occupation or business, the length of time for which the one potentially employed is engaged, whether the work is part of the regular business of the potential employer, and whether the potential employer is or is not in business.[15] To support this contention, appellants note M&D, Turbo Turtle, and Johnson were engaged in the same business of transporting goods; M&D was hired to transport the load in question by Northern Ag, which believed M&D would be the sole carrier of the loads; and M&D's own drivers were transporting other loads in the same order for Northern Ag. Appellants claim these factors, when added to the cell phone calls and text messages between M&D and Johnson and the exclusive language of the Turbo Turtle agreements with M&D and Johnson, create an issue of fact as to whether Johnson was an employee of M&D.

---

[15] See *Mays, supra* note 9.

However, along with the analysis in the previous section, these additional factors do not determine Johnson was M&D's employee. The fact that M&D had a trucking division as well as a brokerage division is not determinative of an employer-employee relationship. Johnson was in a distinct business from M&D in that M&D operated a brokerage division within its company utilizing outside drivers; Johnson was not exclusively bound to M&D's shipments and could take other work from Turbo Turtle, including during harvesttime; and Johnson did not use M&D's equipment and leased the equipment from Turbo Turtle instead. Johnson contracted with Turbo Turtle and not M&D and had driven for Turbo Turtle for only approximately 30 days prior to the accident, a relatively short amount of time. Additionally, while M&D did drive some of the Northern Ag loads utilizing its own drivers, it was also common for M&D to dispatch outside companies and drivers for the Northern Ag loads.

Considering all of the above, the record is insufficient to create a genuine issue of material fact that the relationship went beyond that of an independent contractor to an employer-employee.

## 2. Liability as Independent Contractor

Appellants next argue M&D would be liable for Johnson's negligence, even if Johnson were an independent contractor.

[13-15] Generally, one who employs an independent contractor is not liable for physical harm caused to another by the acts or omissions of the contractor or its servants.[16] Our case law has recognized four exceptions to the general rule.[17] Specifically, a party contracting with an independent contractor can be liable for physical harm caused to another if (1) the contracting party retains control over the contractor's work, (2) the contracting party is in possession and control of premises,

---

[16] *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014).

[17] *Id.*

(3) a statute or rule imposes a specific duty on the contracting party, or (4) the contractor's work involves special risks or dangers.[18] We often refer to the latter three exceptions as involving nondelegable duties.[19] A nondelegable duty means that a contracting party to an independent contractor, by assigning work consequent to a duty, is not relieved from liability arising from the delegated duties negligently performed.[20]

### (a) Retention of Control

While M&D did not retain sufficient control over Johnson's work to subject M&D to liability for Johnson's negligence as an agent or employee, appellants allege that M&D retained some control over the relevant work and that M&D is therefore liable for a failure to exercise reasonable care in the use of that control.[21]

[16-19] To fall within this exception to the general rule of nonliability, the contracting party's involvement in overseeing the work must be substantial.[22] Furthermore, that control must directly relate to the work that caused the injury.[23] In other words, the key element of control must exist with respect to the very thing from which the injury arose.[24] To impose liability, the contracting party must have (1) supervised the work that caused the injury, (2) actual or constructive knowledge of the danger that ultimately caused the injury, and (3) the opportunity to prevent the injury.[25]

Appellants argue M&D acted in a supervisory role when it assigned Johnson the load from Northern Ag, had actual

[18] See *id.*

[19] See *id.*

[20] See *id.*

[21] See Restatement (Second) of Torts § 414 (1965).

[22] See *Gaytan, supra* note 16.

[23] See *id.*

[24] See *Cutlip v. Lucky Stores*, 22 Md. App. 673, 325 A.2d 432 (1974).

[25] See *Gaytan, supra* note 16.

and/or constructive knowledge that Johnson was unavailable for driving under the hours-of-service requirements of FMCSA and FMCSR,[26] and had the opportunity to use a different driver who was not in violation of those requirements but failed to do so. Specifically, appellants point to the communication between M&D and Johnson on August 27, 2014, where M&D text messaged to cancel a load Johnson was carrying at 9:01 a.m., text messaged to dispatch him on a load from Nebraska to North Dakota 30 minutes later, and communicated with Turbo Turtle to dispatch Johnson on the load carried during the accident at 11:43 p.m.

[20] The record does not support appellants' contention that M&D had sufficient supervision of Johnson's work. Having the right to control and supervise the work in this context implies having the ability to oversee and direct the manner in which the work that caused the injury is carried out.[27] As we have already concluded, M&D did not have control of the method or means in which Johnson performed his work. Furthermore, concerning the Northern Ag load specifically, the text messages indicate that Johnson was provided, at that time, with only the pickup, destination, and content details of the load. The messages did not direct Johnson on the timing of the load, the route, and what stops to make. Without more, nothing in the record indicates that Johnson was required to drive beyond the hours-of-service restriction and that M&D had control and supervision of Johnson to direct him to make such a violation.

### (b) Control of Premises

Appellants argue M&D is liable as the party in possession and control of premises where physical harm is caused.

---

[26] See 49 C.F.R. § 395.3(2) (2017).

[27] *Kime, supra* note 4. See, also, *Harris v. Velichkov*, 860 F. Supp. 2d 970 (D. Neb. 2012), *affirmed sub nom. Harris v. FedEx Nat. LTL, Inc.*, 760 F.3d 780 (8th Cir. 2014); *Gaytan, supra* note 16.

Appellants allege M&D had a lease agreement with Turbo Turtle and, as a result, was in control of Johnson and the truck and trailer.

Under 49 C.F.R. § 376.2(e) (2016), a "lease" is defined as "[A] contract or arrangement in which the owner grants the use of equipment, with or without [a] driver, for a specified period to an authorized carrier for use in the regulated transportation of property, in exchange for compensation." In addition, 49 C.F.R. §§ 376.12 and 376.22 (2017) require that a lease contain the following provisions: provide the lessee exclusive possession, control, and use of the equipment for the duration of the lease and the lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease; clearly specify the legal obligation of the lessee to maintain insurance coverage for the protection of the public; and provide that control and responsibility for the operation of the equipment shall be that of the lessee from the time possession is taken until possession is returned. Further, 49 C.F.R. §§ 376.11 and 376.22 (2017) provide specific requirements for the operation of a lease, including that receipts are to be provided from the lessee to the lessor when possession is taken, the equipment must be identified as being operated by the lessee, and the equipment must carry a copy of the lease.

This contract was not a lease agreement whereby M&D was leasing Turbo Turtle's drivers, trucks, and trailers when it communicated a job. Here, Turbo Turtle and Johnson maintained control over the use of the truck and trailer. Turbo Turtle was responsible for the equipment's upkeep, insurance, and signage, as well as the hiring of the drivers, and Johnson and Turbo Turtle were free to coordinate the means and manner in which they accomplished the loads M&D provided to them. Moreover, there was no evidence in the record that either Turbo Turtle or Johnson received receipts when M&D allegedly took possession of the equipment, that the equipment displayed any identifying information that it was

being operated by M&D, or that Johnson carried a copy of the contract.

Appellants cite to Plambeck's deposition for the proposition that the contract was a lease. During that deposition, Plambeck made two comments regarding a lease agreement and indicated that prior to the contract, M&D had two other agreements with Turbo Turtle. The first contract he described as a "lease agreement that M&D . . . used as a standard lease agreement for any companies that [M&D] brokered loads to." The second contract he described as a "trailer lease" which allowed Turbo Turtle to pull one of M&D's trailers.

The record before us is void of the first contract of which Plambeck testified. As a result, we cannot determine the terms or conditions of that agreement and whether it would qualify as a lease under FMCSA and FMCSR. Upon a question as to whether the trailer lease was still in effect in 2014, Plambeck stated that "I would call [the contract] a lease agreement too, so which one do you mean?" Plambeck then testified that Turbo Turtle's right to lease a trailer from M&D continued on an as-needed basis. The contract itself authorized Turbo Turtle to lease one of M&D's trailers. However, later in his deposition, Plambeck testified that none of the equipment involved in the accident was being leased from M&D. Noting the failure of the contract to comply with FMCSA and FMCSR requirements for a lease, Plambeck's statement, without more, does not imply that M&D treated the contract as a lease agreement for Turbo Turtle's drivers and equipment, nor does it make the contract such a lease agreement.

### (c) Statute or Rule

#### (i) Statutory Employer-Employee Under FMCSA and FMCSR

Appellants argue FMCSA and FMCSR impose liability on M&D, because Johnson was a driver being controlled exclusively by M&D at the time of the accident and, as such, Johnson was M&D's statutory employee.

In support of their argument, appellants cite to several definitions within the FMCSR. Specifically, 49 C.F.R. § 376.2(d)(2) which defines "owner" as someone "who, without title, has the right to exclusive use of equipment," and 49 C.F.R. § 390.5 (2017) which defines an "employer" as someone "who owns or leases a commercial motor vehicle in connection with [a business affecting interstate commerce]" and "employee" as someone "employed by an employer" and can include "an independent contractor while in the course of operating a commercial motor vehicle." Appellants claim M&D had the right to exclusive use of Johnson and his equipment, M&D had this right to exclusive use in connection with its interstate trucking business, and, thus, Johnson was an M&D employee under FMCSR, even if considered an independent contractor.

However, appellants are incorrect in their claim that M&D was the owner of the equipment. As analyzed above, Johnson and his equipment were not exclusively controlled by M&D at the time of the accident, Johnson's equipment was owned by Turbo Turtle who was responsible for its maintenance and insurance, and the contract between M&D and Turbo Turtle was not a lease agreement for that equipment. Because M&D was not the owner of Johnson's equipment and did not lease Johnson's equipment, M&D does not meet the definition of employer and Johnson does not meet the definition of employee under FMCSA and FMCSR.

### (ii) Motor Carrier Under
### FMCSA and FMCSR

Appellants argue that FMCSA and FMCSR impose liability on M&D, because M&D was the motor carrier of the Northern Ag load. M&D, in turn, argues it was acting as a broker of the load in question and, thus, did not have liability under FMCSA and FMCSR.

[21,22] FMCSA and FMCSR generally require that a commercial motor carrier operate only if registered and that such

registration requires proof of financial responsibility in order to ensure collectability of a judgment against the motor carrier.[28] This act and these regulations protect the public and provide financial responsibility for motor carrier accidents by creating a legal right and a duty to control vehicles operated for the regulated motor carrier's benefit.[29]

[23] The FMCSR, at 49 C.F.R. § 390.5, codified as Neb. Rev. Stat. § 75-362(31) (Cum. Supp. 2014), defines "motor carrier" as

> a for-hire motor carrier or a private motor carrier. The term includes a motor carrier's agents, officers and representatives as well as employees responsible for hiring, supervising, training, assigning, or dispatching of drivers and employees concerned with the installation, inspection, and maintenance of motor vehicle equipment and/or accessories. . . . [T]his definition includes the terms *employer* and *exempt motor carrier*.

For purposes of federal interstate transportation law, a "broker" means:

> a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation.[30]

The FMCSR, at 49 C.F.R. § 371.2(a) (2017), distinguishes motor carriers from brokers by stating:

> Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning

---

[28] See, 49 U.S.C. §§ 13901 and 13906 (2012 & Supp. V 2017); *Harris, supra* note 27.

[29] See, e.g., 49 U.S.C. § 14102(a)(4) (2012); *Crocker v. Morales-Santana*, 854 N.W.2d 663 (N.D. 2014); *Tamez v. Southwestern Motor Transport, Inc.*, 155 S.W.3d 564 (Tex. App. 2004).

[30] 49 U.S.C. § 13102(2) (2012). See, also, 13 C.J.S. *Carriers* § 87 (2017).

of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport.

As such, when distinguishing between a motor carrier and a broker, the determinative question is whether the disputed party accepted legal responsibility to transport the shipment.[31]

In arguing M&D was acting as a motor carrier on Johnson's Northern Ag load, appellants allege M&D was a licensed motor carrier, M&D was Northern Ag's exclusive point of contact, Northern Ag identified M&D as the motor carrier on internal documents, M&D solicited the loads from Northern Ag for its own account, M&D directly dispatched Johnson, and M&D had control over Johnson and his truck and trailer.

[24] Whether M&D was also a licensed motor carrier is indeterminative to the question whether M&D was the motor carrier for purposes of liability for Johnson's negligence. Instead, this question requires inquiry into M&D's actions with regard to the particular load at issue.[32] A transportation company may have authority to act as a shipper, broker, or carrier, and a court must focus on the specific transaction at issue—not on whether the transportation company acts as a motor carrier in other transactions.[33] At the time of the accident, M&D had both a trucking and a brokerage division to its company with separate licenses and insurance plans, while Turbo Turtle was a licensed motor carrier with its own license and insurance. M&D gave the load in question to Turbo Turtle and its

---

[31] See *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292 (11th Cir. 2018).

[32] See, e.g., *Mass v. Braswell Motor Freight Lines, Inc.*, 577 F.2d 665 (9th Cir. 1978); *Hewlett-Packard v. Brother's Trucking Enterprises*, 373 F. Supp. 2d 1349 (S.D. Fla. 2005); *Nipponkoa Ins. Co., Ltd. v. C.H. Robinson Worldwide, Inc.*, No. 09 Civ. 2365(PGG), 2011 WL 671747 (S.D.N.Y. Feb. 18, 2011) (unpublished memorandum and order).

[33] *Harris, supra* note 27.

driver. There is no evidence M&D instructed Johnson beyond providing pickup and destination information. Johnson drove Turbo Turtle's truck and trailer, and Turbo Turtle's signage and motor carrier number were displayed on the equipment. After the accident, the police report listed Turbo Turtle as the motor carrier.

The fact that M&D held itself as Northern Ag's exclusive source of contact is insufficient to convert M&D into a motor carrier under FMCSA and FMCSR.[34] There is no requirement under FMCSA and FMCSR that a broker cannot be the exclusive source of contact for a transportation customer. The record further demonstrates this is a normal practice of the trucking industry. For example, Northern Ag was a freight brokerage company that arranged loads for transport with customers to whom M&D and other of Northern Ag's brokers and carriers had no direct contact.

Appellants contend that M&D solicited the loads from Northern Ag for its own account and that, as a result, M&D was a motor carrier for the load at issue. In support of their contention, appellants rely on *Schramm v. Foster*[35] for the holding that an entity may be treated as a motor carrier, as opposed to a broker, if it engages in solicitation for its own account. However, there was no evidence that M&D was contractually obligated to transport the Northern Ag loads exclusively and there was no evidence that M&D conveyed to Northern Ag that it would be transporting the load itself. In fact, a Northern Ag manager testified that on behalf of Northern Ag, he solicited brokers as well as carriers to fill shipping orders. In addition, Plambeck testified that Northern Ag was aware that M&D was a brokerage company and that M&D was using M&D drivers and also using brokered carriers for Northern Ag loads. Plambeck also testified that M&D

---

[34] See *Schramm v. Foster*, 341 F. Supp. 2d 536 (D. Md. 2004).

[35] *Id.*

never told Northern Ag that it would haul all of the offered loads through M&D's trucking division. As a result, there is no evidence that M&D solicited the Northern Ag loads as a motor carrier for its own account.

M&D did not directly dispatch Johnson on the load in question. Instead, Northern Ag contacted M&D with the load information, M&D communicated that information to Turbo Turtle, and Turbo Turtle communicated that information to Johnson. Johnson's cell phone records indicate Turbo Turtle was the one who contacted Johnson about the Northern Ag load, while M&D had directly dispatched Johnson on a previous North Dakota load. Johnson communicated with Turbo Turtle about routes and stops but there was no evidence in the record establishing that Johnson communicated with M&D about the means and method of the load. However, even if M&D had directly dispatched Johnson on the Northern Ag load, such an action would not determine M&D was a motor carrier. The text messages in which M&D instructed Johnson on the North Dakota load and the text messages in which Turbo Turtle instructed Johnson on the Northern Ag load provided only pickup and destination information. The provision of such information is consistent with the role of a third-party logistics company with the responsibility of coordinating shipment of the freight relative to the customer's needs.[36]

While relevant to the question of whether M&D legally bound themselves to transport the Northern Ag loads, Northern Ag listing M&D on the bill of lading and other pickup/dropoff records is not dispositive evidence M&D was acting as the motor carrier. The identification of a transportation company as the "carrier" on the bill of lading does not prove that the transportation company was in fact the carrier in this transaction. In *Schramm*, the court found that a bill of lading prepared by a third party, which identified the defendant as the

---

[36] See *id*.

"carrier" of the load was insufficient to establish the defendant's carrier status, because the defendant played no role in its preparation.[37]

In the instant matter, the record indicates that typically two different documents were generated for each load shipped: one by the customer when the load was picked up and one by Northern Ag when the load was dropped off. Nothing in the record indicates that M&D had any involvement in preparing either document. For the load involved in the accident, only the pickup document was generated, because the load was not dropped off. The pickup document listed M&D as the carrier and was created by the customer. However, as discussed above, when the load was picked up, the truck and trailer displayed Turbo Turtle's signage and carrier number. M&D's signage and carrier number were not displayed on the truck and trailer, and there is no evidence in the record indicating that Johnson was carrying any sort of lease agreement for M&D to use Turbo Turtle's truck. As such, Turbo Turtle's involvement with the shipment would have been readily apparent to the customer at the pickup location. Similarly, the Northern Ag manager's testimony that Northern Ag had no knowledge M&D was assigning loads to Turbo Turtle does not account for this readily apparent information from the dropoff locations. When considering these factors in the context of the entire record, Northern Ag's internal records and its manager's testimony listing M&D as the motor carrier are insufficient on their own to lead a reasonable trier of fact to determine M&D was the carrier.

Appellants' contention that M&D had control over Johnson and his equipment fails to support a finding that M&D was a motor carrier for the load in question. The record on appeal does not indicate that M&D had exclusive control over Johnson and his equipment. As analyzed above, the contract between M&D and Turbo Turtle did not create or operate as a lease

---

[37] *Schramm, supra* note 34.

agreement, Turbo Turtle was not required to make specific drivers available to M&D, Johnson did not directly contract with M&D, Johnson's agreement with Turbo Turtle was that he could drive only Turbo Turtle's equipment for loads issued by Turbo Turtle or M&D but there was no such restriction if Johnson used other equipment, there was an exception in the M&D and Turbo Turtle contract where Turbo Turtle could drive outside loads for harvesttime, and Turbo Turtle owned and was responsible for maintenance and insurance on the equipment.

Based upon our review of the record, all of the above factors indicate that there is insufficient evidence to present a genuine issue of material fact that M&D was the motor carrier of the load at issue.

### 3. NEGLIGENT HIRING, TRAINING, OR SUPERVISION

Appellants argue that the district court erred in dismissing their claim that M&D negligently hired, trained, or supervised Johnson. Under this assignment, appellants contend that the district court's reasoning was tainted by its incorrect determination that M&D was a broker and not a motor carrier.

[25] We have previously held that an employer is subject to liability for physical harm to third persons caused by the employer's failure to exercise reasonable care in selecting an employee, even if such employee is an independent contractor.[38] However, as we determined above, the record fails to provide sufficient evidence to present a genuine issue of material fact that Johnson was M&D's employee or that M&D negligently hired, trained, or supervised Johnson.

[26] FMCSA and FMCSR require motor carriers to obtain and maintain records on each of the drivers they employ, such as driving and medical records.[39] However, as we determined

---

[38] *Kime, supra* note 4.

[39] See 49 C.F.R. §§ 391.25 (2017) and 391.51(a) (2014).

above, the record also fails to provide sufficient evidence to present a genuine issue of material fact that M&D was the motor carrier of the load at issue and instead demonstrates M&D was acting as a broker.

Thus, the district court did not err in dismissing appellants' claim that M&D negligently hired, trained, or supervised Johnson.

## 4. CROSS-APPEAL

Because we determine the district court did not err in granting M&D's motion for summary judgment and dismissing appellants' claims, we need not address M&D's cross-appeal that the district court erred in failing to find appellants' claim of respondeat superior was barred by the settlement between appellants, Turbo Turtle, and Johnson.

## V. CONCLUSION

For the reasons stated above, there are no genuine issues of material fact. M&D is entitled to a judgment as a matter of law, because Johnson's relationship with M&D was that of an independent contractor; M&D did not have liability under that independent contractor relationship for Johnson's negligence; and M&D was a broker of the load at issue and not a motor carrier responsible for Johnson's hiring, training, or supervision. Thus, the district court did not err in granting M&D's motion for summary judgment and dismissing appellants' claims.

AFFIRMED.