IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MCCARTNEY V. ZURCHER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MICHAEL L. MCCARTNEY AND SHARON G. MCCARTNEY, APPELLANTS,

V.

LENARD D. ZURCHER, ET AL., APPELLEES.

Filed November 4, 2025.    No. A-24-342.

Appeal from the District Court for Webster County: MORGAN R. FARQUHAR, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Michael F. Coyle and Jordan W. Adam, of Fraser Stryker, P.C., L.L.O., for appellants.

Cathy S. Trent-Vilim, of Lamson, Dugan & Murray, L.L.P., and Jarrod Crouse, of Baylor, Evnen, Wolfe & Tannehill, for appellee Cooperative Producers, Inc.

Ronald F. Krause and Michael R. Faz, of Cassem, Tierney, Adams, Gotch & Douglas, for appellee KEA Constructors, LLC.

MOORE, PIRTLE, and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

This case arises from an accident on May 5, 2020, in which a tractor-trailer driven by Lenard D. Zurcher collided with the rear end of a backhoe driven by Michael L. McCartney, resulting in severe injuries to McCartney. McCartney and his wife, Sharon G. McCartney (the McCartneys), filed suit in the district court for Webster County, alleging negligence claims against Zurcher, his employer, the farm cooperative that owned the facility where the tractor-trailer was loaded, and the subcontractor responsible for work on the bridge where the accident occurred. The McCartneys appeal from the court's order that granted summary judgment in favor of the

- 1 -

cooperative and the subcontractor. For the reasons set forth herein, we affirm the district court's order granting summary judgment in favor of the subcontractor and granting summary judgment in favor of the cooperative as to the McCartneys' claims of negligence based upon the theories of vicarious liability or negligent entrustment, hiring, training, retention, or supervision, but we reverse the court's order granting summary judgment in favor of the cooperative as to the McCartneys' claim for CPI's direct negligence in loading the tractor-trailer. We remand the cause for further proceedings.

## II. STATEMENT OF FACTS

### 1. ACCIDENT AND PARTIES

McCartney was seriously injured in an accident on May 5, 2020, when a tractor-trailer driven by Zurcher collided with the rear of the backhoe driven by McCartney. The accident occurred on the Indian Creek bridge near Red Cloud, Nebraska, on Highway 136. At the time of the accident, the bridge was under construction and traffic on the bridge was restricted to one lane. Sometime prior to the accident and prior to the planned bridge work, a pre-existing guardrail from the embankment approach to the bridge site was removed and signs were placed noting the one lane bridge and warning drivers to slow down. "Type III" barricades were placed warning of the unprotected bridge ends; concrete protection barriers were placed on the south side of the lane only. McCartney and Zurcher were both driving east on the highway. Zurcher was traveling between 40 and 45 miles per hour when he saw the sign indicating a narrow bridge in half a mile; the evidence is conflicting with respect to how much the tractor-trailer slowed down prior to impact with the backhoe. Upon collision, the two vehicles continued through the bridge and impacted the south concrete protection barriers before exiting the lane on the north side of the highway and overturning. McCartney's injuries resulted in amputation of part of his left foot and his right leg below the knee.

The McCartneys filed a complaint in the district court, naming as defendants Zurcher; Scott Kort Trucking (SKT) (Zurcher's employer); Scott A. Kort (Kort); Kenneth D. Kort (Kenneth); Cooperative Producers, Inc. (CPI); KEA Constructors, LLC (KEA); and Bostwick Irrigation District in Nebraska (Bostwick). Bostwick, McCartney's employer, was named as a defendant to determine its workers' compensation subrogation rights. Although the trailer in question was titled in Kenneth's name at the time of the accident, Kort claimed that he had purchased the trailer from Kenneth prior to the accident (the record includes a bill of sale documenting the purchase). The court granted summary judgment in favor of Kenneth on the McCartneys' claims against him on July 19, 2022, concluding that for purposes of liability, Kenneth was not the owner of the trailer at the time of the accident, and he was not liable to the McCartneys under the theories of negligence asserted against him. Bostwick and Kenneth are not part of the present appeal.

CPI operates a farmer-owned cooperative headquartered in Hastings, Nebraska. CPI employs drivers to transport grain and feed to storage facilities in central Nebraska, some of which are owned by CPI. CPI employs some of its own drivers (CPI drivers), but it also contracts with independent contractors (third-party drivers) to meet its grain hauling needs. CPI entered into a contract with Kort, doing business as SKT, in March 2015, wherein SKT agreed to transport cargo and other freight for CPI in exchange for payment for SKT's services. CPI's payments to SKT were based on the rate per bushel of grain delivered in each load SKT hauled for CPI.

SKT owned two tractor-trailers. SKT employed Zurcher and paid him an hourly wage as a driver for SKT. At the time of the accident, Zurcher was driving one of SKT's tractor-trailers (a combination consisting of a Peterbilt tractor and Timpte trailer), delivering a load of corn belonging to CPI from the CPI facility in Franklin, Nebraska, to the CPI facility in Red Cloud.

KEA, a subcontractor, was responsible for demolishing and replacing certain bridges per its subcontract with Werner Construction, Inc. (Werner). KEA was to perform specified portions of the work required under Werner's contract (the main contract) with the Nebraska Department of Transportation (NDOT) for what is referred to in the record as the Red Cloud Project (the project). The project included the demolition and replacement of three separate bridges, including the Indian Creek bridge where the accident occurred. NDOT owned the Indian Creek bridge. Prior to the accident, KEA employees were performing construction work on the Indian Creek bridge. KEA employees were on site at the time of the accident and assisted in the accident response. KEA did not design or have any involvement in the implementation of the traffic control plan for the project or have any management or oversight responsibilities on the project other than for bridge work. The traffic control plan was designed by NDOT engineers. Other subcontractors were responsible for guardrail removal and placement; placement of traffic control devices, including signs for lane closure; placement of barricades and barriers; and traffic control signals (plans called for traffic lights at the other two bridges but not at the Indian Creek bridge). We note that the construction plans with respect to the Indian Creek bridge portion of the project provided that the existing guardrail should remain in place as long as possible, and, if removed, be reinstalled as soon as possible.

## 2. CLAIMS AGAINST CPI AND KEA

The McCartneys filed a complaint in the district court on August 4, 2020, and an amended complaint on December 23. In addition to negligence claims against Zurcher, Kort, and/or SKT (the trucking defendants), the McCartneys set forth various claims against CPI and KEA. In their claims against CPI, they alleged that CPI was negligent in (1) loading or allowing Zurcher's tractor-trailer to be loaded with a load of corn exceeding the tractor-trailer's gross weight restrictions, allowing Zurcher to operate the tractor-trailer with such a load, and/or failing to otherwise exercise reasonable and proper care under the circumstances; (2) entrusting the trucking defendants to haul the load of corn; and (3) hiring, training, retaining, and/or supervising the trucking defendants. In their first negligence claim, the McCartneys also alleged that CPI was vicariously liable for the negligence of the trucking defendants, as well as the negligence of "its agents, employees, and joint venturers," under the doctrine of respondeat superior, all theories of agency, and/or all theories of joint venture. In connection with the negligent hiring claim, the McCartneys alleged that CPI had a duty to take proper steps and actions to ensure the trucking defendants had adequate training and experience in how to properly and safely operate a tractor-trailer, as well as a duty to supervise the actions of the trucking defendants, including but not limited to, while they were working for or with CPI, operating a tractor-trailer for CPI, hauling a load for CPI, or using a tractor-trailer over which CPI had control. The McCartneys did not specifically allege the nature of CPI's duty with respect to any of the other negligence claims. With respect to all of the negligence claims against CPI, they alleged that McCartney's injuries were a direct and proximate result of CPI's negligence.

As to KEA, the McCartneys alleged that KEA, its employees, agents, workers, joint venturers, and/or others were responsible for ensuring that the project was safe and did not present a hazard for traffic driving on the highway and the Indian Creek bridge. They alleged that KEA was negligent in failing to use proper care to ensure the project was safe and did not present a hazard for traffic; failing to use proper care to ensure its employees, agents, joint venturers, and/or workers had the proper knowledge, training, experience, and education to safely operate and/or work on the project such that it did not present a hazard for traffic driving on the highway; and failing to otherwise exercise reasonable and proper care under the circumstances. They alleged that McCartney's injuries were a direct and proximate result of KEA's negligence.

### 3. SUMMARY JUDGMENT MOTIONS AND OTHER PRETRIAL MOTIONS

Both CPI and KEA filed motions for summary judgment on May 17, 2023 (a prior summary judgment motion filed by KEA was dismissed by the district court without prejudice when the McCartneys sought more time to gather evidence in opposition to the motion).

Certain motions concerning the McCartneys' rebuttal expert witness, Thomas B. Lauhon, are also relevant to the present appeal. On May 18, 2023, the trucking defendants filed a motion to strike Lauhon "as a claimed rebuttal expert." They asserted that Lauhon's report was "not a response to any of the combined defendants' experts" and was instead "an attempt to get another bite at the apple." They alleged that Lauhon did not respond to new matters introduced by any of the defense experts and that he was being used to "improperly bolster and reiterate the case in chief." On June 2, KEA filed a motion in limine and a motion to strike. In the motion in limine, KEA asked the court to prohibit any testimony or evidence by Lauhon that KEA had any obligations with respect to concrete protection barriers or other traffic control devices, any ability to direct or control removal of the guardrail, or that it could deviate in any way from the traffic control plan. They also asserted that Lauhon was not a proper rebuttal expert although he had been named as such. KEA's motion to strike Lauhon also asserted that he proffered improper rebuttal opinions that neither explained, disproved, nor counteracted any new evidence or opinions introduced by the defendants and that his opinions were an improper attempt to bolster the McCartneys' case-in-chief and present cumulative expert testimony. The motions seeking to exclude Lauhon were addressed by the district court in its order granting summary judgment in favor of CPI and KEA. Relevant details of the opinions of the parties' various expert witnesses received at the summary judgment hearing are set forth below.

### 4. SUMMARY JUDGMENT HEARING

The district court heard the motions for summary judgment on June 15, 2023. The summary judgment record is voluminous. As noted by the court in its summary judgment order, the court "critically reviewed the entire case file and operative exhibits, which consisted of more than four file boxes of written material." The evidence received included depositions of Zurcher, Kort, and various CPI and KEA employees; the independent contractor agreement between SKT and CPI; CPI emails documenting internal communications, as well as communications with CPI drivers and third-party owner-operators hauling for CPI; numerous photographs of the project, accident scene, and other aspects of this case; certain executive orders entered by the governor suspending various requirements for commercial motor vehicles and motor carriers; a plethora of NDOT and

Werner documents with respect to the project, including the Werner-KEA subcontractor agreement; the reports of various expert witnesses; and numerous other documents. In addition to the evidence set forth above, we have set forth certain undisputed evidence in the background section of this opinion. Other evidence is discussed below in our analysis.

(a) SKT Independent Contractor Agreement

Under the agreement, dated March 20, 2015, CPI engaged SKT "as an independent contractor" for the transport of cargo and other freight. SKT represented that it had the equipment, personnel, trucks, and permits necessary for purposes of the agreement and agreed to maintain "in full force and effect" all required licenses and permits for all equipment used by it in performance of the agreement. SKT was to hire, provide, supervise, and pay any and all personnel required to perform under the agreement in SKT's sole discretion. The agreement did not guarantee that CPI would give SKT a particular number of assignments, and SKT was free to perform for other parties. CPI agreed to pay SKT in accordance with the rate(s) periodically posted by CPI, identified in trucking assignments, or otherwise provided by CPI. We will discuss additional provisions of this agreement as necessary in our analysis.

(b) Evidence About Werner-KEA Subcontractor Agreement

As relevant to the present appeal, we note the following provisions of the Werner-KEA subcontract.

Article 2 of the subcontract covered the scope of the work to be performed by KEA. Section 2.1 stated KEA "shall perform all work in strict accordance with the Subcontract Documents (the 'Subcontract Work'), and all work incidental thereto and to the satisfaction of the Contractor [Werner] and the Owner [NDOT]." The "Subcontract Documents" included the subcontract, the prime contract between NDOT and Werner, and other specified documents. Subsection §2.2 provided:

> *With respect to the Subcontract Work*, the Subcontractor shall assume toward the Contractor all obligations, risks, and responsibilities which the Contractor has assumed towards the Owner under the Prime Contract including without limitation, all requirements relating to notice, quality, quantity, warranty obligations, and timeliness of the work. The terms and conditions of the Subcontract regarding the Subcontract Work to be performed by the Subcontractor shall be in addition to and not in substitution for any of the terms of the Prime Contract and the other Subcontract Documents, except that where a provision of such documents conflicts with a provision of this Subcontract, this Subcontract shall govern.

(Emphasis supplied.)

Article 7 of the subcontract concerns the subcontractor's obligations and provides in § 7.4, "The Subcontractor shall carefully examine this Subcontract and the Subcontract Documents, *identify those portions affecting the Subcontract Work*, and notify the Contractor in writing of any deficiencies, discrepancies, ambiguities, inconsistencies, or errors before proceeding with the affected work." (Emphasis supplied). And, in § 7.8, it provides:

> Where the Work includes traffic control, Subcontractor must follow the traffic control plan, if any, included in the Prime Contract. If the Prime Contract does *not* contain a traffic control plan, Subcontractor must prepare and implement a traffic control plan that is compliant with both: (i) the Prime Contract, and (ii) the current requirements for the location where the Work is to be performed. The preparation and implementation of a traffic control plan shall be incidental to Subcontractor's Work.

(Emphasis supplied). The record is clear that NDOT engineers designed the traffic control plan for this project.

Jason Muhle, one of the owners of KEA, testified that KEA was responsible for tearing out the three bridges included in the project and replacing them in their entirety. Muhle testified regarding the traffic control plan for the project. According to Muhle, a traffic control plan is something "designed by a traffic engineer" as part of a construction project's "phased traffic flow." KEA does not design or put together traffic control plans. Muhle indicated that the traffic control plan in this case was part of the "full project plan and specifications for the project." While KEA did not look at the traffic control plan prior to May 5, 2020, KEA did review the portions of the plans and specifications for the project relating to the bridge work. Muhle stated that the concrete safety barriers were placed by the traffic control subcontractor on the job. He explained that when KEA had finished demolishing and rebuilding one half of a bridge involved in the project, KEA would inform Werner of that fact and ask Werner to send out the relevant subcontractor to "switch the traffic." KEA would have contacted the NDOT with any safety concerns as to the traffic control plan for the project. Muhle agreed that bridge work can be dangerous for KEA's employees, but he testified that KEA did not have any safety concerns because they were working behind the concrete protection barrier. He also indicated that KEA "was comfortable" with the traffic control for the Indian Creek bridge both before and after the accident. Muhle agreed that oncoming traffic was one hazard for drivers traversing the Indian Creek bridge during the project. He also agreed that "a one-lane bridge, where oncoming traffic doesn't have a stoplight," was "the most hazardous situation [for traffic flow]" that he had seen "in [his] career doing bridge work."

### (c) Loading Process on Day of Accident

The record shows that on the day of the accident, Zurcher pulled onto the scale at CPI's Franklin facility where the empty tractor-trailer was weighed. He then proceeded to the loading area where CPI employees loaded the truck. There was no communication between Zurcher and these employees beyond signals telling him to stop and pull forward as needed. Zurcher did not inform the CPI employees that he needed a particular size of load. Next, Zurcher circled back to the scale where the loaded tractor-trailer was again weighed. He then received the scale ticket and left the Franklin facility. The gross weight of the loaded tractor-trailer when Zurcher left the Franklin facility was 91,740 pounds. According to Zurcher, the load did not "feel heavy," and he testified that if it had, he would have dumped some of the corn. Zurcher did not pay attention to the actual loaded weight of the tractor-trailer; he did not look at the scale ticket until the end of the day.

### (d) Evidence About Tractor-Trailer's Loaded Weight

At trial, there was evidence addressing the question of whether the tractor-trailer was "overloaded" when it left CPI's Franklin facility. The evidence on this issue was somewhat confusing and contradictory and clearly dependent on the criteria used to judge said overloading, i.e., was the tractor-trailer loaded beyond the appropriate weight for driving on Nebraska roadways, loaded beyond the appropriate weight defined by the vehicle manufacturer, or were those weight limits irrelevant in light of certain executive orders that were in effect at the time of the accident? We have set forth certain evidence about the tractor-trailer and relevant statutory definitions to illustrate the difficulty of determining whether the tractor-trailer was, in fact, overloaded. Information about the executive orders and expert testimony on the question of overloading and the effect of the tractor-trailer's loaded weight are addressed in subsequent sections. For purposes of this appeal, we find a better question to be what effect the tractor-trailer's loaded weight of 91,740 pounds had with respect to causation of the accident. And, if the tractor-trailer's loaded weight played a role in causation, whether CPI had any responsibility for its role in loading it.

The tractor-trailer driven by Zurcher had a total of five axles (three on the tractor and two on the trailer). "Gross vehicle weight" is defined as the sum of "the empty weights of a truck or truck-tractor and the empty weights of any trailer, semitrailer, or combination thereof with which the truck or truck-tractor is to be operated in combination at any one time, plus the weight of the maximum load to be carried thereon at any one time." Neb. Rev. Stat. § 60-330 (Reissue 2021). See, also, Neb. Rev. Stat. § 60–6,294 (Reissue 2021) (limiting how much weight vehicles can carry per axle on Nebraska roadways). One of the McCartneys' experts opined in terms of "gross vehicle weight rating" (GVWR), which he indicated was 50,000 pounds for the tractor and 65,000 pounds for the trailer. GVWR is defined as "the value specified by the manufacturer as the loaded weight of a single motor vehicle or trailer." Neb. Rev. Stat. § 60-331 (Reissue 2021). See, also, Neb. Rev. Stat. § 60-469 (Reissue 2021) (GVWR is value specified by manufacturer as loaded weight of single vehicle).

Kort's testimony added another layer of confusion. Kort testified that the tractor-trailer operated by Zurcher was "licensed" or "license plated" for, and "mechanically" able, to pull up to a gross weight of 94,000 pounds. He also affirmed that "[m]echanically the trailer would hold [that weight]," and "[u]nder normal circumstances, mechanically, the brakes would stop it." Kort was not asked about the GVWR for either the tractor or the trailer; when he was asked if the trailer was "rated" for 94,000 pounds, he said, "It's not what the trailer is rated for."

### (e) Executive Orders

On March 13, 2020, the governor issued Executive Order No. 20-01, subsequently extended by Executive Order No. 20-21. The Executive Orders suspended the length and weight hauling requirements of federal and state law, granting commercial motor vehicles and motor carriers a waiver from "the U.S. Department of Transportation - Federal Motor Carrier Safety Administration, pursuant to 49 CFR part 390.23 to allow relief from 49 CFR parts 390 through 399," suspending these requirements "through the duration of the motor carrier's assistance in the pandemic relief effort." Order No. 20-01 was in effect from March 13 until May 1, 2020. Order No. 20-21 extended the waiver and suspension "through the duration of the COVID-19 state of

emergency." The orders specified that drivers operating under the orders "shall carry a copy of the proclamation with them as evidence of their direct support to the State of Nebraska during this emergency period." They also specified that motor carriers "not directly supporting pandemic response efforts" in Nebraska or that have an out-of-service order "in effect" may not take advantage of the relief from regulation provided by the executive orders. The executive orders do not define "pandemic relief effort," "pandemic response efforts," or "direct support." But, see, 49 C.F.R. § 390.5T (2024) (defining terms including "[e]mergency" and "[d]irect assistance").

The executive orders were in effect at the time of the accident, and deposition testimony from CPI's chief executive officer shows that CPI believed it and third parties with whom it contracted to deliver grain on its behalf were providing what he termed "essential services" that were within the "pandemic relief effort" and "pandemic response efforts" covered by the orders and that the orders allowed CPI to exceed regular weight limits.

Zurcher did not provide a copy of the executive orders to law enforcement at the time of the accident. There is evidence, however, that CPI sent out copies of the orders to third-party drivers, including Kort, prior to the accident, and both Zurcher and Kort testified that Kort provided a copy to Zurcher prior to the accident. According to Zurcher, Kort provided him with a copy in April 2020, which he kept on a clipboard in his truck. CPI also provided copies to Kort after the accident (including in an email instructing third-party owner-operators to give copies to their drivers). A Nebraska State Patrol report shows that on May 5, 2020, Kort advised a trooper that he was "unaware of any permits his driver was claiming;" in his deposition, Kort denied this statement. Zurcher was interviewed by a Nebraska State Patrol trooper on May 13 and produced "a copy of the governor's exemption" at that time. And, at that time, Zurcher claimed Kort had given him a copy of the order about 3 weeks prior.

### (f) Post-Accident Investigation

Investigation by the Nebraska State Patrol following the accident showed multiple violations relating to the braking system on the tractor-trailer that were present prior to the accident and would have placed the tractor-trailer out-of-service due to the level of inoperative or defective brakes. Evidence in the record also shows that some tires on the tractor-trailer were nearly bald and that the tractor-trailer did not have a current NDOT annual inspection sticker. Although several of the McCartneys' experts opined that the condition of the truck would have rendered it out-of-service at the time of the accident, there is no evidence of an actual out-of-service order in effect for the tractor-trailer. See Neb. Rev. Stat. § 75-362(35) (Reissue 2018) (defining out-of-service order). See, also, 49 C.F.R. § 390.5T (also defining out-of-service order, as well as other relevant terms).

### (g) Expert Opinions

#### (i) Stuart B. Brown Opinion

Plaintiff's expert Stuart B. Brown, a mechanical engineer specializing in forensic engineering investigations, was asked to evaluate factors affecting the stopping distance and associated impact velocity of the tractor-trailer. Brown opined that the speed of the tractor-trailer (he did not reference a particular speed), the condition of its braking system and tires, the weight of the tractor-trailer, and the road inclination (the Indian Creek bridge is located at the bottom of

a hill) all increased the stopping distance. According to Brown, the overloaded weight of the tractor-trailer contributed to both the causation and severity of the accident and the severity of the impact speed would have been reduced if the tractor-trailer's weight had been lower and its brakes fully functional. He defines "overloaded" as a weight exceeding the tractor-trailer's "legally permissible combined gross vehicle weight" of 80,000 pounds. Brown opined that an overloaded tractor-trailer creates peculiar risks requiring special precautions for its safe operation. He noted that an overloaded trailer can become top-heavy, increasing the potential for rollover. He also noted the risks of greater kinetic energy at a given speed and the accumulation of greater energy traveling down inclines, both of which require greater stopping distances. Brown emphasized that prior to operating an overloaded tractor-trailer, safety components and braking systems must be in working order. He opined that the necessary special precautions were not taken in this case. He further opined that if the tractor-trailer's weight had been lower and its brakes fully functional, the accident may have been prevented entirely. We note that Brown also opined that the executive orders did not apply "to tractor/trailers that are out-of-service, which the . . . tractor-trailer was at the time of the crash."

## (ii) Steve F. Sokol Opinion

Plaintiff's expert Steve F. Sokol, a licensed professional engineer with experience in accident reconstruction and civil engineering and specializing in forensic engineering investigations, was retained to inspect and document the crash site, inspect the vehicles and equipment involved, and perform an engineering analysis of the crash. Sokol inspected the scene of the accident and the tractor-trailer in May 2020. In January 2021, he also participated in a joint inspection of the tractor-trailer by various engineers retained by the parties in this case. According to Sokol, the January 2021 inspection revealed numerous brake and tire defects in the tractor-trailer, which existed prior to the accident. Sokol also found no evidence that the tractor-trailer had undergone a current required NDOT annual inspection prior to the accident. Sokol opined that the executive orders were not applicable in this case because the tractor-trailer "should have been, and would have been" placed out-of-service on the day of the accident due to "its defects and multiple [N]DOT violations." He noted that there was no evidence "Defendants" were directly supporting pandemic response efforts in Nebraska. He also noted that after the accident, Kort and Zurcher reported they were unaware of the orders and did not have the orders with them at the time of the accident. Sokol opined that the inoperative/defective brakes on the tractor-trailer, the lack of current NDOT inspection, and the excessive weight of the fully loaded tractor-trailer were all a cause of Zurcher's inability to stop and a cause of the accident. Sokol defined "excessive weight" in terms of the tractor-trailer's "normal gross maximum weight restriction" of 80,000 pounds.

Sokol also opined regarding the temporary traffic control devices and removal of the guardrail at the scene. He opined that the use of traffic lights or flaggers near the Indian Creek bridge would have put drivers on notice of the need to stop and would have controlled the direction of traffic flow across the bridge. He opined that concrete protection barriers on the north side of the bridge most likely would have prevented the vehicles from leaving the road and encountering the steep slopes on that side of the bridge. He opined that bridge construction involves dangers to motorists on and near the bridge that can result in significant injury and death and that bridge

construction companies like KEA must be familiar with those dangers and risks and must guard against them. He opined that KEA should have foreseen that removal of the guardrail created a danger to drivers and that if KEA had recognized the dangerous condition created by the steep slopes on the north side of the bridge and installed concrete protection barriers like those in place on the south side, the vehicles most likely would have remained upright on the roadway.

*(iii) Kevin M. Haney Opinion*

The McCartneys' expert Kevin M. Haney, a certified accident reconstructionist with a bachelor's degree in biomedical engineering, concluded that at the time of the accident the tractor had three brakes out of adjustment and one that was nonfunctioning and that the trailer had three non-functioning brakes. Haney also noted that there was no evidence of "a current annual inspection" for either the tractor or the trailer. According to Haney, based on the condition of the braking system, the tractor-trailer was out-of-service per the "North American Standard Out-of-Service Criteria" at the time of the accident. He opined that it "should have been placed, and was, out of service" before the accident and that "Defendants" should not have used or loaded the tractor-trailer on the day of the accident. Haney opined that "Defendants" failed to properly inspect and maintain the tractor-trailer and failed to ensure it was safe, fit for travel, and in good working condition on the day of the accident.

Haney also opined that the tractor-trailer was "overloaded" at the time of the accident, which adversely affected its braking capabilities and "placed the tractor-trailer combination over its GVWR." Haney observed that the scale ticket from CPI for the load in question showed a "tare weight" for the tractor-trailer before loading of 29,500 pounds and a loaded weight of 91,740 pounds, yielding a net weight for the load of 62,220 pounds. Haney then stated:

> With 62,220 pounds of corn, this would leave only 2,780 pounds for the weight of the trailer to not violate the GVWR. The average weight of a Peterbilt 379 is approximately 20,000 pounds. Comparing that to the tare weight from the CPI load ticket from the date of the collision would give the Timpte trailer an approximate weight of 9,500 pounds. Adding this trailer weight to the net weight of 62,220 pounds of corn would put the total weight of the trailer at 71,720 pounds which would be approximately 6,720 pounds over the GVWR for the trailer [of 65,000]. Being over 3 tons over the GVWR would negatively affect the braking capability of the tractor and trailer combination by the Timpte trailer being heavier than the weight the manufacturer intended the trailer to be operated at.

Haney also opined that the executive orders did not apply to the load of corn Zurcher was transporting at the time of the accident. He noted there was no evidence that the load being transported was directly supporting the pandemic response, and he stated that the orders do not apply to "tractor-trailers that are out-of-service due to their mechanical condition." He also stated that the orders did not give Zurcher, Kort, or CPI permission to ignore safety precautions and mechanical requirements for tractor-trailers or give CPI the ability to load the tractor-trailer beyond "what it [could] safely haul." Given that the tractor-trailer was "overloaded by nearly 6 tons," Haney opined that "Defendants should have taken, but failed to take, precautions to ensure that the [tractor-trailer] (including its brakes) was working properly, safely, and [was] fit for travel."

### (iv) Patrick J. Boyle Opinion

KEA's expert Patrick J. Boyle, a licensed professional engineer, is currently the construction engineer for Norfolk, Nebraska, and previously worked for NDOT for many years as a highway project manager and then district construction engineer. In his report, Boyle discussed details of the contracts and construction plans for the project, noting the responsibilities of the various subcontractors involved in the project and which specific Werner employees were responsible for traffic control. Boyle noted that Werner's daily traffic control inspection form indicated that all traffic control devices were in place as designed at the time of the accident, and Boyle opined that the project was in full conformity with NDOT traffic control design and specifications of the Manual on Uniform Traffic Control Devices (MUTCD).

Boyle found no evidence that KEA "did wrong" and no evidence of the breach of any duty KEA owed either to NDOT or the motoring public. Based on his education, training, work history and experience, and his review of the accident and project documents identified in his report, Boyle opined that there was no evidence KEA was responsible in any way for the accident. He noted opinions of the McCartneys' experts (Sokol and another expert whose opinion was not received into evidence in the summary judgment proceedings) focusing on removal of the guardrail at the bridge ends and a claimed failure to put up concrete protection barriers on the north side of the bridge, which the McCartneys' experts claimed should have been KEA's responsibility. Boyle opined that these opinions were not consistent with the contract and would be contrary to standard NDOT practice. He stated that as a matter of standard practice on an NDOT project, KEA would have been entitled to rely on the expertise of traffic control designers and traffic control implementation and enforcement by the subcontractors who were responsible for those components of the project. He stated that KEA's responsibility on the project was "solely for bridge reconstruction" and that if KEA had "altered the traffic control in any way[,] they would have been in violation of their contract." Boyle stated that according to the Werner-KEA subcontract, work to be performed by the subcontractor was to be "in addition to and not in substitution for any of the terms of the prime contract and the other subcontract documents."

### (v) Thomas B. Lauhon Opinion

The McCartneys' rebuttal expert Thomas B. Lauhon was excluded by the district court as a trial rebuttal witness, but his opinions were considered by the court in connection with the summary judgment motions. Lauhon has a bachelor of science degree in construction science and management and experience in accident investigation, construction project safety, and analysis of construction contract documents, plans, and specifications. In Lauhon's report, he questioned the timing of the guardrail removal on the north side of the bridge. Lauhon opined that because KEA had employees and personnel working on the bridge, KEA should have foreseen the dangers presented by the removal of the guardrail and the steep ditches and slopes on the north side of the bridge. According to Lauhon, once the guardrails had been "inappropriately" removed, KEA should have "requested and installed, at a minimum, concrete barriers to protect both motorists and workers." He opined that if KEA had requested and installed concrete protection barriers on the north side of the bridge, the vehicles involved in the accident would not have been able to go into the ditch and would not have "encountered the steep slope" on the northeast side of the bridge. He opined that KEA knew or should have known that drivers would not recognize the danger

posed by the removal of the guardrail, including the likelihood that they would go into the ditch if a crash occurred. Lauhon also opined that KEA had a "contractual obligation" to ensure the traffic control plan and the project were "proper and safe." Lauhon cited various portions of the Werner-KEA subcontract in support of his assertion as to this and other alleged "contractual obligation[s]" of KEA. Lauhon concluded that KEA's actions and omissions described in his report were "a cause" of the accident.

## 5. RESOLUTION BY DISTRICT COURT

On July 13, 2023, the district court granted the summary judgment motions filed by CPI and KEA. First, the court addressed the McCartneys' claims of CPI's vicarious liability for the trucking defendants' negligence. The court concluded that there was no genuine issue of material fact as to SKT's status as an independent contractor for CPI and Zurcher's status as an employee of SKT. Next, the court considered exceptions under which CPI might be vicariously liable for harm caused by an independent contractor's employees (i.e., harm caused by Zurcher as an employee of SKT). The court found no genuine issues of material fact with respect to any of the applicable exceptions and that summary judgment in favor of CPI as to the McCartneys' respondeat superior claims was appropriate. The court also found no genuine issues of material fact with respect to the McCartneys' negligent entrustment and negligent hiring claims against CPI and that summary judgment in CPI's favor on those claims was appropriate as well.

As to any direct negligence by CPI in loading the tractor-trailer with an excessive weight, the district court noted evidence that the trucking defendants were free to unload corn if they felt the weight was unsafe. The court also noted that the executive orders were in effect, found that the McCartneys did not provide any legal basis for their assertion that the load in question did not fall under the executive orders, and stated that the executive orders did not clearly specify what constituted direct support of the pandemic response efforts. The court found it "reasonable for CPI to believe that hauling agricultural product for feeding livestock fell under the [e]xecutive [o]rder[s]." It also noted that there was no evidence the tractor-trailer was actually placed out-of-service and no evidence that CPI knew about the defective brakes. The court concluded that CPI was not responsible to ensure that SKT complied with the executive orders, including carrying a copy of the orders in the tractor-trailer at issue.

Finally, the district court considered CPI's argument that the inoperable brakes on the tractor-trailer driven by Zurcher were an efficient intervening cause, severing any causal connection between CPI's alleged negligence and the injuries sustained by McCartney. The court concluded that Zurcher's inability to stop or slow down before hitting the backhoe was an efficient intervening cause. Having found no genuine issue of material fact with respect to the issues presented in CPI's motion for summary judgment, the court granted the motion as to all claims asserted against CPI.

Turning to KEA's motion for summary judgment, the district court found as a matter of law that KEA had no authority over or control of the traffic control devices and did not participate in the design, construction, or implementation of traffic control for the project. The court noted that other subcontractors were explicitly selected for traffic control and the design and placement of barriers and guardrails on the project and that contractors hired for those services would, by

virtue of undertaking those obligations, have a clear duty to act. The court concluded that KEA was not in that position and did not undertake that responsibility.

The district court addressed the McCartneys' argument that KEA should have recognized the lack of a guardrail as a safety issue, concluding that even if KEA had informed NDOT of the issue and stopped working until the guardrail was replaced, only NDOT had the authority to close the road and bridge to public travel. See Neb. Rev. Stat. § 39-1345 (Reissue 2016). The court concluded that if KEA had stopped working and NDOT chose not to close the road and bridge, KEA's cessation of work would have had no impact on the accident. The court also rejected the McCartneys' argument, based on Lauhon's report, that the contracts entered into by Werner, NDOT, and the various subcontractors, including KEA, created a special duty in KEA with respect to the guardrail and traffic control. Specifically, the court found Lauhon's opinions to be "misguided" and "overreaching" and that his analysis was "incorrect in imposing any additional duty on KEA or any other contractor not explicitly contracted to perform traffic control or work on traffic control devices for the project."

Finally, the district court also found that Zurcher's negligence was an efficient intervening cause and the sole contributing cause of the accident, thereby relieving KEA of liability. Having found no genuine issue of material fact with respect to the issues presented in KEA's motion for summary judgment, the court granted the motion as to the claims asserted against KEA. Accordingly, the court dismissed KEA's remaining motions (i.e., including KEA's motions to exclude Lauhon) as moot. The court also granted the trucking defendants' motion to strike Lauhon as a rebuttal witness for the McCartneys "under the totality of the circumstances and the narrowing of the issues to be decided at trial."

The McCartneys filed a motion to alter or amend and motion to set aside and vacate the summary judgment, which were denied by the district court on September 28, 2023.

## 6. TRIAL

A jury trial was held on the McCartneys' claims against the trucking defendants. The jury found in favor of the McCartneys, and the district court entered judgment on those claims in favor of the McCartneys.

## III. ASSIGNMENTS OF ERROR

The McCartneys assign that the district court erred in (1) granting CPI's motion for summary judgment, (2) granting KEA's motion for summary judgment, and (3) striking their rebuttal witness, Lauhon, based on an inapplicable "totality of circumstances" test.

The McCartneys also assign that the district court erred in denying their motion to alter or amend judgment and motion to set aside and vacate summary judgment, but they do not specifically argue this assigned error (although they argue in their reply brief that their "entire [initial] brief" was the specific argument in support of the fourth assignment of error since the motion raised all of the same issues discussed in their initial brief). Reply brief for appellants at 14. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting error to be considered by the appellate court. *Evert v. Srb*, 33 Neb. App. 244, 13 N.W.3d 728 (2024). Accordingly, we will not address the McCartneys' fourth assigned error beyond our discussion of the arguments raised in connection with their first three assigned errors.

See *In re Estate of Harchelroad*, 318 Neb. 573, 18 N.W.3d 103 (2025) (appellate court is not obligated to engage in analysis that is not needed to adjudicate controversy before it).

## IV. STANDARD OF REVIEW

An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *Strahan v. McCook Hotel Group*, 317 Neb. 350, 10 N.W.3d 187 (2024). An appellate court reviews the district court's ruling on a motion for summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Scott v. Lancaster Cty. Sch. Dist. 0001*, 318 Neb. 670, 18 N.W.3d 417 (2025).

## V. ANALYSIS

### 1. SUMMARY JUDGMENT FOR CPI

The McCartneys assign that the district court erred in granting CPI's motion for summary judgment.

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Scott v. Lancaster Cty. Sch. Dist. 0001, supra*. The party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial. *Galloway v. Husker Auto Group*, 318 Neb. 178, 14 N.W.3d 218 (2024). If the burden of proof at trial would be on the nonmoving party, then the party moving for summary judgment may satisfy its prima facie burden either by citing to materials in the record that affirmatively negate an essential element of the nonmoving party's claim or by citing to materials in the record demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Id.* If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law. *Id.*

To prevail in any negligence action, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and resulting damages. *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024). Whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Id.* The duty in a negligence case is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk. *Id.*

In a negligence case, determining the standard of care to be applied in a particular case is a question of law. *Id.* The ultimate determination of whether a party deviated from the standard of care and was therefore negligent is a question of fact, and a finder of fact must determine what conduct the standard of care would require under the particular circumstances presented by the evidence and whether the conduct of the alleged tort-feasor conformed with the standard. See *id.*

- 14 -

(a) Vicarious Liability

In the operative complaint, the McCartneys alleged that CPI was vicariously liable for the negligence of the trucking defendants under theories including the doctrine of respondeat superior. Under the doctrine of respondeat superior, an employer may be held vicariously liable for the negligence of an employee while acting within the scope of employment. *Rodriguez v. Lasting Hope Recovery Ctr.*, 308 Neb. 538, 955 N.W.2d 707 (2021). However, one who employs an independent contractor is generally not liable for physical harm caused to another by the acts or omissions of the contractor or its servants. See *Sparks v. M&D Trucking*, 301 Neb. 977, 921 N.W.2d 110 (2018). This is the general rule, because an employer of an independent contractor generally has no control over the manner in which the work is to be done by the contractor, so the contractor, rather than the employer, is the proper party to be charged with the responsibility of preventing the risk and bearing and distributing it. See *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014).

*(i) Employee or Independent Contractor*

The district court found no merit to the McCartneys' respondeat superior claim based upon an employee-employer relationship between CPI and SKT or Zurcher. The court concluded as a matter of law that CPI entered into an independent contractor agreement with SKT, that the agreement and the actual relationship between them was an independent contractor relationship, and that Zurcher was an employee of SKT and not CPI. The court did not err in that regard.

Ordinarily, a party's status as an employee or an independent contractor is a question of fact. *Sparks v. M&D Trucking, supra*. However, where the facts are not in dispute and where the inference is clear that there is, or is not, a master and servant relationship, the matter is a question of law. *Id.* By stating "where the inference is clear," the Nebraska Supreme Court means that there can be no dispute as to pertinent facts pertaining to the contract and the relationship of the parties involved and only one reasonable inference can be drawn therefrom. *Id.* A determination of a party's status as an employee or an independent contractor is determined from all the facts in the case and depends on the facts underlying the relationship of the parties irrespective of the words or terminology used by the parties. *Id.*

No single test exists for determining whether one performs services for another as an employee or as an independent contractor, and the following 10 factors must be considered: (1) the extent of control which, by the agreement, the potential employer may exercise over the details of the work; (2) whether the one potentially employed is engaged in a distinct occupation or business; (3) the type of occupation, with reference to whether, in the locality, the work is usually done under the direction of the potential employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the potential employer or the one potentially employed supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the one potentially employed is engaged; (7) the method of payment, whether by the time or by the job; (8) whether the work is part of the regular business of the potential employer; (9) whether the parties believe they are creating an agency relationship; and (10) whether the potential employer is or is not in business. *Id.*

## a. Extent of Control

The extent of control is the chief factor distinguishing an employment relationship from that of an independent contractor. *Sparks v. M&D Trucking*, 301 Neb. 977, 921 N.W.2d 110 (2018). In examining the extent of a potential employer's control over the worker, it is important to distinguish control over the means and methods of the assignment from control over the end product of the work to be performed. *Id.* An independent contractor is one who, in the course of an independent occupation or employment, undertakes work subject to the will or control of the person for whom the work is done only as to the result of the work and not as to the means or methods used. *Id.* Even the party contracting with an independent contractor may, without changing the status, exercise such control as is necessary to assure performance of the contract in accordance with its terms. *Id.*

The McCartneys argue that CPI controlled the means and methods the trucking defendants used to complete the work of hauling loads for CPI and that the district court did not give this factor sufficient weight in its analysis. Specifically, they argue that CPI controlled the weight of the load to be transported, and despite observing that the load in question was overweight, CPI provided Zurcher with the scale ticket, allowing him to leave the Franklin facility. The McCartneys note that the trucking defendants had not hauled grain for anyone else for some time prior to the accident and that CPI communicated directly with Zurcher to let him know that CPI needed grain transported from Franklin to Red Cloud on the day in question. We agree with the district court's analysis that these communications from CPI and the procedures for loading grain, dumping excess weight, and unloading grain at CPI's facilities relate to the methods of assignment and the ways in which CPI ensured the performance of the contract between CPI and SKT and do not reflect CPI's control of the means and methods used by the trucking defendants in performing their work under the contract. The trucking defendants were free to accept other work, had ownership of and control over the maintenance of the equipment they used, and were free to unload a portion of grain loaded by CPI in the designated area even if CPI did not ask them to do so.

The McCartneys point to evidence that CPI provided Kort with information about the use of a phone application that CPI used to dispatch "agronomy loads [(fertilizer)] and sprayer applications," which provided drivers with directions to a farm to pick up a load. There is no evidence that this application was used to provide directions for drivers hauling grain from one CPI facility to another or that Kort ever used the application when he hauled agronomy loads for CPI. There was also no evidence that this application gave instructions to the drivers as to the means and methods of performing their work. The McCartneys also point to evidence of various emails sent by CPI to drivers, including the trucking defendants, providing information about various safety measures, and they argue that this is evidence of training and supervision of the trucking defendants by CPI. A review of these emails shows that they are generally informative and reflect information provided by CPI in aid of assuring performance of the contract between it and SKT in accordance with its terms and not evidence of control of the means and methods by which the trucking defendants accomplished their work.

Any control exercised by CPI over the transportation of its grain by the trucking defendants was to assure the end product of the work to be performed pursuant to its agreement with SKT. The fact that CPI determined when and where grain was to be picked up and delivered for a

particular price and the fact that it had certain procedures in its facilities for the loading and unloading of grain and the dumping of excess weight does not show control over the means and methods used in performing the work. Although CPI provided certain information to facilitate the safe and efficient delivery of its product from one location to another and regularly communicated directly with Zurcher, CPI did not exercise control over the manner in which the trucking defendants operated the tractor-trailers owned by Kort and it did not control the routes actually taken by the trucking defendants. CPI did not service or maintain Kort's equipment and did not control whether it would be driven by Kort, Zurcher, or someone else hired by Kort. Accordingly, the methods used to perform the work under the contract were not subject to CPI's control.

Considering the McCartneys' arguments on appeal and our review of the record, there is insufficient evidence to create a genuine issue of material fact that CPI exerted the extent of control necessary over the trucking defendants for a determination that the relationship went beyond that of an independent contractor (and the independent contractor's employee) to an employer-employee relationship.

### b. Remaining Factors

The remaining factors also clearly indicate that SKT was an independent contractor of CPI, that Zurcher was an employee of SKT, and that none of the trucking defendants were employees of CPI.

SKT as a trucking company and Kort and Zurcher as truckdrivers were engaged in a distinct business. See, *Kime v. Hobbs*, 252 Neb. 407, 562 N.W.2d 705 (1997) (finding truckdriver was engaged in distinct occupation); *Cajiao v. Arga Transport*, 30 Neb. App. 700, 972 N.W.2d 433 (2022). CPI also had its own fleet of tractor-trailers and employed drivers to drive them, but this is not determinative. CPI's fleet of drivers was just one component of CPI's business, which includes the storing and shipping of grain and feed and the provision of fertilizer products to farmers. Unlike SKT, who was free to haul for other entities, CPI's drivers were employed to haul only for CPI. See *Sparks v. M&D Trucking*, 301 Neb. 977, 921 N.W.2d 110 (2018). A commercial driver's license (CDL) is required to perform the work done by the trucking defendants. See *Cajiao v. Arga Transport, supra* (truckdriver who worked as semi-tractor driver for 15 years prior to accident and whose work required CDL engaged in occupation requiring specialized skill).

CPI did not supply the instrumentalities, tools, and the place of work for the trucking defendants. The tractor-trailer driven by Zurcher was owned by Kort and licensed, fueled, and maintained by SKT. Zurcher began working for SKT in 2019. The fact that SKT hauled almost exclusively for CPI during Zurcher's employment by SKT does not negate the independent contractor agreement between CPI and SKT, which provided that SKT was free to haul for third parties as well as the general public. The record is clear that CPI paid SKT a per bushel rate for grain hauled by SKT, that SKT paid Zurcher an hourly wage, and that SKT, not CPI, provided "1099" tax forms to Zurcher. In support of their arguments, the McCartneys' also point to the fact that CPI sometimes paid Zurcher or Kort, driving for SKT, by the hour to move grain from a CPI bunker to a nearby CPI elevator. Zurcher's and Kort's occasional engagement in this work for CPI does not mean that they were CPI employees, as opposed to drivers for SKT. Nor does the fact that CPI paid an hourly rate for that type of work mean that Zurcher and Kort were CPI employees.

The independent contractor agreement between CPI and SKT specified that it was not to be construed as creating an employer-employee relationship. The McCartneys argue, however, that CPI treated the trucking defendants like its employees. They point to emails sent to both CPI drivers and third-party owner-operators by CPI about the locations of NDOT stops, referring to drivers as part of the transportation team, and referring to drivers as "running billboard[s]" for CPI. Unlike CPI's vehicles, which were marked with CPI's logo, the tractor-trailers owned by SKT were unmarked. None of these emails supersede the independent contractor agreement. A review of these emails shows that CPI encouraged all drivers to comply with safety rules and regulations, something SKT also agreed to pursuant to the independent contractor agreement and was required to do regardless of any such agreement or encouragement by CPI.

## c. Conclusion

Viewing the evidence in the light most favorable to the McCartneys, we conclude that the district court did not err in finding, as a matter of law, that SKT was an independent contractor of CPI, that Zurcher was an employee of SKT, and that none of the trucking defendants were employees of CPI.

### (ii) Liability for Negligence of Independent Contractor

Generally, one who employs an independent contractor is not liable for physical harm caused to another by the acts or omissions of the contractor or its servants. *Sparks v. M&D Trucking*, 301 Neb. 977, 921 N.W.2d 110 (2018). Nebraska case law has recognized four exceptions to the general rule. Specifically, a party contracting with an independent contractor can be liable for physical harm caused to another if (1) the contracting party retains control over the contractor's work, (2) the contracting party is in possession and control of premises, (3) a statute or rule imposes a specific duty on the contracting party, or (4) the contractor's work involves special risks or dangers. *Id.* Courts often refer to the latter three exceptions as involving nondelegable duties. *Id.* A nondelegable duty means that an employer of an independent contractor, by assigning work consequent to a duty, is not relieved from liability arising from the delegated duties negligently performed. See *id.* We note that the possession and control of premises exception relates to the duty to provide a safe place to work. See *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014) (one in possession and control of premises has duty to exercise reasonable care to keep premises in safe condition while contract is in course of performance; this duty relates to physical condition of premises, not manner in which work is done). In the summary judgment proceedings, the McCartneys did not allege the existence of any statutes or rules imposing a specific duty on CPI. Accordingly, the district court found that exception to the general rule inapplicable. The court considered and rejected the McCartneys' arguments as to the other three exceptions. On appeal, the McCartneys only present arguments with respect to the first and fourth exceptions.

### a. Retention of Control Over Contractor's Work

To fall within the control exception to the general rule of nonliability, the contracting party's involvement in overseeing the work must be substantial, and that control must directly relate to the work that caused the injury. See *Sparks v. M&D Trucking, supra*. In other words, the

key element of control must exist with respect to the very thing from which the injury arose. *Id.* To impose liability, the contracting party must have (1) supervised the work that caused the injury, (2) actual or constructive knowledge of the danger that ultimately caused the injury, and (3) the opportunity to prevent the injury. *Id.*

The record does not support the McCartneys' assertion that CPI supervised the trucking defendants' work. Having the right to control and supervise the work implies having the ability to oversee and direct the manner in which the work which caused the injury is carried out. *Id.* As discussed above, CPI did not have control of the method or means by which the trucking defendants performed their work. As noted by the district court, CPI provided a dispatch schedule and rate sheet, loaded the corn in the tractor-trailer, and provided Zurcher with a scale ticket, but CPI did not require Zurcher to leave its facility with any set weight. The issuance of the scale ticket allowed CPI to know how much corn left the Franklin facility and how much to pay SKT for delivery of the load to Red Cloud. The McCartneys point to CPI's knowledge of the dangers of overweight tractor-trailers and evidence showing CPI was aware that Zurcher had hauled overweight loads many times prior to the accident. However, the evidence also shows that Zurcher had delivered grain for CPI many times previously without incident despite being overloaded on at least some of those occasions.

The McCartneys claim that the accident resulted from a combination of factors, including the poor condition of the brakes and tires on the tractor-trailer, as well as the weight of the load. CPI did not own the tractor-trailer and had no control over its maintenance and operation. CPI had no control over whether Zurcher returned to the designated area to dump any excess grain from the load before transporting the grain or over the manner in which Zurcher delivered the grain. We conclude that CPI did not retain the type of control over the activities that led to the accident sufficient to subject it to liability.

b. Special Risks or Dangers

The McCartneys argue CPI was liable under the special risks or dangers exception because the overloaded tractor-trailer driven by Zurcher at the time of the accident presented a special risk or danger. In other words, they argue that CPI had a nondelegable duty to see that its grain was transported in a nonnegligent manner.

The duty of due care imposed on an employer of an independent contractor when the contractor's work involves special risks or dangers, including work that is inherently dangerous in the absence of special precautions, is a nondelegable duty. *Kime v. Hobbs*, 252 Neb. 407, 562 N.W.2d 705 (1997). A special risk is one that is different from the common risks to which persons in general are commonly subjected by the ordinary forms of negligence which are usual in the community. *Cruz v. Lopez*, 301 Neb. 531, 919 N.W.2d 479 (2018). It must involve some special hazard resulting from the nature of the work done. *Id.*

The McCartneys rely on the opinions of their expert Brown, who opined that an overloaded tractor-trailer creates peculiar risks, requiring special precautions for a driver to operate it safely, and that such precautions were not taken in this case. The Nebraska Supreme Court has held that operating motor vehicles is not an inherently dangerous activity. See *id.* And, in *Kime v. Hobbs, supra*, it held that the transportation of cattle in a tractor-trailer under normal conditions is not an inherently dangerous activity such that it imposes a nondelegable duty on the employer of an

independent contractor to ensure that the cattle are transported in a nonnegligent manner. The *Kime* court observed that other jurisdictions have concluded the risks posed by mechanical malfunctions of a "loaded truck" or that a truck will be overloaded do not present peculiar risks imposing a nondelegable duty on the employer of an independent contractor. See *id.* at 417, 562 N.W.2d at 713, citing, e.g., *Ek v. Herrington*, 939 F.2d 839 (9th Cir. 1991) (holding that transportation of logs did not generally pose peculiar risk of harm but independent contractor's failure to take special precautions to anchor commodity such as several tons of logs may subject employer to liability). See, also, Restatement (Second) of Torts § 416, comment d. at 397 (1965).

The McCartneys do not allege that the corn was not properly secured in the tractor-trailer; their allegations focus on Zurcher's negligent operation of an overloaded vehicle with improperly functioning brakes. These are risks that the employer of an independent contractor is justified in presuming the contractor will act to avoid. See *Kime v. Hobbs, supra*. To the extent the McCartneys' arguments are directed toward its allegations of CPI's own negligence for its role in loading the tractor-trailer, we have addressed that issue below. We conclude that the district court did not err in finding that Zurcher was not engaged in an inherently dangerous activity, which presented peculiar risks, and that CPI had no nondelegable duty to ensure that the corn was transported in a nonnegligent manner.

### (iii) Other Agency Theories of Recovery

In the operative complaint, the McCartneys also alleged that CPI was vicariously liable for the negligence of the trucking defendants under theories of agency and/or joint venture. On appeal, the McCartneys only argue that CPI is liable because the trucking defendants were CPI's agents. An "agent" is a person authorized by the principal to act on the principal's behalf and under the principal's control. *RM Campbell Indus. v. Midwest Renewable Energy*, 294 Neb. 326, 886 N.W.2d 240 (2016). For an agency relationship to arise, the principal manifests assent to the agent that the agent will act on the principal's behalf and subject to the principal's control and the agent manifests assent or otherwise consents so to act. *Id.* The district court did not explicitly address this additional theory as to CPI's alleged vicarious liability, but it examined the factors discussed above as to the extent of CPI's control over the trucking defendants' work and concluded that SKT was an independent contractor of CPI and Zurcher was an employee of SKT. The McCartneys' arguments in this section of their brief do not point to additional evidence sufficient to raise a genuine issue of material fact as to whether the relationship between CPI and the trucking defendants was anything other than as shown above. See *Fitzpatrick v. US West, Inc.*, 246 Neb. 225, 518 N.W.2d 107 (1994) (noting one acting on behalf of another may do so as agent or independent contractor and applying 10-factor independent contractor test to distinguish between them).

### (b) CPI's Own Negligence in Loading Tractor-Trailer

In the operative complaint, the McCartneys alleged that the accident was a proximate result of CPI's negligence in (1) loading the tractor-trailer, or allowing it to be loaded, such that the gross weight restrictions were exceeded, (2) allowing Zurcher to operate the tractor-trailer with a load of corn that exceeded the gross weight restrictions, and/or (3) failing to otherwise exercise reasonable and proper care under the circumstances. The district court rejected this claim for CPI's

direct negligence. The court did not specifically or separately address the question of whether CPI owed any duty to members of the general motoring public (such as McCartney) with respect to CPI's loading of the tractor-trailer; its analysis went more to the issues of breach and causation.

First, the district court noted that while CPI loaded the corn in the tractor-trailer, Zurcher and SKT were free to unload some of the corn if they felt the weight was unsafe. Next, the court noted that the executive orders lifting weight restrictions were in effect, found that the McCartneys did not provide any legal basis for their assertion that the load in question did not fall under the executive orders, and observed that the executive orders did not clearly specify what constituted direct support of the pandemic response efforts. The court then found it reasonable for CPI to believe that hauling agricultural products for feeding livestock fell under the executive orders. In response to the McCartneys' argument that the executive orders did not apply because the tractor-trailer had defects that would have placed it out of service if it had had a current NDOT inspection, the court noted that there was no evidence the tractor-trailer was actually placed out-of-service. The court also noted that there was no evidence that CPI knew about the defective brakes. Finally, the court stated that CPI was not responsible for ensuring that SKT complied with the executive orders, including the requirement of carrying a copy in the tractor-trailer being operated. The court went on to determine that Zurcher's inability to stop or slow down before hitting the backhoe was an efficient intervening cause of the accident, severing any causal connection between CPI's alleged wrongful conduct and McCartney's alleged injuries. Thus, although not explicitly stated, the court found that regardless of any duty owed by CPI with respect to loading the tractor-trailer and regardless of any breach of that duty, the negligence of the trucking defendants with respect to the brakes on the tractor-trailer severed any causal connection between CPI's actions and the accident.

*(i) Duty*

Whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024). The McCartneys did not specify the nature or source of CPI's duty to the McCartneys with respect to loading the tractor-trailer in their complaint. Their arguments on appeal, as did the district court's analysis, focus more on the issues of breach and causation. However, before reaching the elements of breach and causation, it is necessary to first determine the question of duty. The McCartney's arguments appear to be based on the unstated assertion that CPI owed a duty to members of the motoring public (such as McCartney) to load tractor-trailers safely, even those driven by third-party drivers (such as Zurcher) employed by motor carriers (such as SKT). Although it is reasonable to assume that CPI had a general duty to load trucks in a safe manner, the particular question in this case is whether that duty extended to McCartney. Giving the McCartneys the benefit of all reasonable inferences from the record, we cannot say that CPI did not have a duty to load the tractor-trailer with reasonable care.

In negligence cases, the standard of care is typically general and objective and is often stated as the reasonably prudent person standard, or some variation thereof; i.e., what a reasonable person of ordinary prudence would have done in the same or similar circumstances. *Id.* The duty to use reasonable care does not exist in the abstract, but must be measured against a particular set of facts and circumstances. *Id.* When there is conflicting evidence as to what conduct the standard

of care would require under the particular circumstances, it presents an issue for the fact finder to resolve. See *id.*

The question of what duty, if any, one who loads a tractor-trailer for an independent motor carrier has to third parties has not been specifically addressed in Nebraska. In addressing whether CPI owed a legal duty to McCartney, we turn to federal regulations and case law from other jurisdictions for guidance on the subject of the allocation of responsibility for alleged defects in loading between shippers and carriers.

Under the Code of Federal Regulations, commercial truck drivers have an affirmative duty to ensure that their cargo is properly distributed and adequately secured before operating their vehicles. See 49 C.F.R. § 392.9 (2024); See, also, Neb. Rev. Stat. § 75-363 (Supp. 2025) (adopting certain parts of Federal Motor Carrier Safety Regulations and making them applicable to certain intrastate motor carriers not otherwise subject to federal regulations).

The common law rule concerning the allocation of duty between the shipper and carrier for safe and proper loading was summarized by the Fourth Circuit in *United States v. Savage Truck Line, Inc.*, 209 F.2d 442, 445 (4th Cir. 1953) as follows:

> The primary duty as to the safe loading of property is therefore upon the carrier. When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper.

The rule expressed in *Savage*, although not adopted in Nebraska, has been accepted by most federal and state courts. See *Decker v. New England Pub. Warehouse, Inc.*, 749 A.2d 762 (Me. 2000). The policy behind the rule "reflects the practice and understanding in the trucking industry as to carriers having final responsibility for the loads they haul." *Vargo-Schaper v. Weyerhaeuser Co.*, 619 F.3d 845, 849 (8th Cir. 2010). The *Savage* rule "simply extends the industry's reasonable understanding to negligence suits involving carriers and shippers," expanding beyond cases involving damage to cargo to include cases of personal injuries sustained by employees of carriers. *Decker v. New England Pub. Warehouse, Inc., supra*, 749 A.2d. at 766-67. But as the *Decker* court noted in a footnote to the basic rule:

> The situation would be markedly different in a case involving a party outside of the trucking industry. Pedestrians and non-commercial motorists, to name two possible third parties, injured in an accident caused by a shipper's negligent loading of cargo would still be able to sue that shipper for compensation despite the *Savage* rule. Shippers could not rely on *Savage* to bar claims from those not involved in the industry and who had no opportunity to remedy any negligence. Neither could a shipper escape liability when it loaded a sealed cargo hold and instructed the carrier not to inspect the load. See [49 C.F.R.] § 392.9(b)(4) [(2000)].

*Decker v. New England Pub. Warehouse, Inc., supra*, 749 A.2d at 767, n.3.

Other federal courts who have examined the issue of a shipper's duty in light of the *Savage* rule have similarly concluded that the principles inherent in the *Savage* rule do not bar claims against the shipper involving a party outside the trucking industry. See *Syngenta Crop Prod., Inc.*

*v. Doyle Brant, Inc.*, No. 3:06-CV-84-2, 2008 WL 167293 (W.D. Ky. Jan. 16, 2008). See, also, *Jenkins v. Immedia, Inc.,* 389 F. Supp. 3d 925, 934 (D. Colo. 2019) (holding "The *Savage* rule, which has the inevitable effect of imposing all-or-nothing liability on carriers, must succumb to Minnesota's comparative fault framework so that the jury can have the opportunity to properly apportion a percentage of fault to [the shipper] for its alleged negligence if it so chooses").

We make a similar finding here. Having undertaken the responsibility of loading the tractor-trailer, we find that CPI had a duty to do so with reasonable care. And even if that does not reflect the "primary duty" in relation to the carrier, it does amount to a duty which can be fleshed out through Nebraska's comparative fault statutes. Having determined that CPI owed a duty here, we now turn to the issue of breach.

### (ii) Breach

When determining whether appropriate care was exercised, the fact finder must assess the foreseeable risk at the time of the defendant's alleged negligence. *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024). Deciding what is reasonably foreseeable generally involves common sense, common experience, and application of the standards and behavioral norms of the community. *Id.* Because the extent of foreseeable risk depends on the specific facts of the case, it cannot be usefully assessed for a category of cases; small changes in the facts may make a dramatic change in how much risk is foreseeable. *Id.* Analyzing foreseeability requires consideration of what the defendants knew, when they knew it, and whether a reasonable person would infer from those facts that there was a danger. *Id.*

The record contains evidence that CPI knew there were risks in general involved in overloading trucks. And although there was evidence offered by experts suggesting that the tractor-trailer driven by Zurcher was overloaded, there appears to be a conflation between whether the term "overloaded," as used in the record, relates to the gross weight restrictions per the manufacturer, the gross weight restrictions issued by regulatory authorities, or both. We find the distinction significant as it may relate to other evidence regarding the Governor's executive orders, what weight restrictions relate to stopping distance which the McCartneys argue factored into the accident and its severity, and other issues which may impact upon foreseeability and whether CPI exercised reasonable care in loading the tractor-trailer.

Because foreseeability depends on the specific facts of the case, courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter. *Id.* On this record, there appears to be questions of fact as to those essential questions noted above. Accordingly, we defer such determination to the trier of fact. Viewing the evidence in the light most favorable to the McCartneys, as we must, we cannot say as a matter of law that CPI did not have a duty to exercise reasonable care in loading the tractor-trailer or that it did not breach that duty. We therefore turn to the issue of causation.

### (iii) Causation

The district court found that Zurcher's inability to stop or slow down before hitting the backhoe was an efficient intervening cause of the accident, severing any causal connection between CPI's alleged wrongful conduct and the injuries sustained by McCartney.

An efficient intervening cause is new and independent conduct of a third person, which itself is a proximate cause of the injury in question and breaks the causal connection between the original conduct and the injury. *Latzel v. Bartek*, 288 Neb. 1, 846 N.W.2d 153 (2014). The causal connection is severed when (1) the negligent actions of a third party intervene, (2) the third party had full control of the situation, (3) the third party's negligence could not have been anticipated by the defendant, and (4) the third party's negligence directly resulted in injury to the plaintiff. *Id.* The doctrine that an intervening act cuts off a tort-feasor's liability comes into play only when the intervening cause is not foreseeable. *Id.* But if a third party's negligence is reasonably foreseeable, then the third party's negligence is not an efficient intervening cause as a matter of law. *Id.*

Although the trucking defendants' negligence with respect to the condition of the tractor-trailer's brakes was not foreseeable by CPI, the McCartneys presented evidence showing that the accident was not solely caused by the condition of the brakes (i.e., they presented evidence that the loaded weight of the tractor-trailer also contributed to Zurcher's inability to stop and increased the severity of the accident). Where separate and independent acts of negligence by different persons combine to produce a single injury, each participant is liable for the damage, although one of them alone could not have caused the result. *Jacobs Engr. Group v. ConAgra Foods*, 301 Neb. 38, 917 N.W.2d 435 (2018).

Viewing the evidence in the light most favorable to the McCartneys, we find that a genuine issue of material fact exists with respect to whether any negligence of CPI in loading the tractor-trailer was a contributing factor to the accident.

## (c) Negligent Entrustment

In count two of the operative complaint, the McCartneys alleged that CPI was negligent in entrusting the tractor-trailer and/or the load of corn to the trucking defendants. They alleged that CPI knew or should have known that the trucking defendants were inexperienced, incompetent, and/or would be reckless in using the tractor-trailer involved in the accident and hauling the load of corn in the tractor trailer; were incapable of properly and safely using a tractor-trailer, pulling a trailer, and/or hauling loads in a trailer without endangering others; and/or were likely to operate a tractor-trailer, pull a trailer, and haul loads in a trailer in a dangerous way. The McCartneys' negligent entrustment claim is most accurately described as an assertion that CPI negligently entrusted the activity of hauling its corn to the trucking defendants.

It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself or herself in the activity in such a manner as to create an unreasonable risk of harm to others. *DeWester v. Watkins*, 275 Neb. 173, 745 N.W.2d 330 (2008). See, also, Restatement (Second) of Torts § 308 at 100 (1965). Comment a. to § 308 explains that "under the control of the actor" indicates that "the third person is entitled to possess or use the thing or *engage in the activity* only by the consent of the actor, and that the actor has reason to believe that by withholding consent he can prevent the third person from using the thing or *engaging in the activity*." (Emphasis supplied.) *Id.* comment a, at 100.

In granting CPI judgment on this claim, the district court determined that CPI did not have any authority to control Zurcher's use of the tractor-trailer, given the independent contractor relationship between CPI and SKT and SKT's employment of Zurcher. The court also found that

CPI had no reason to believe that Zurcher was incompetent, inexperienced, or reckless as a tractor-trailer operator as it did not vet or employ him, and it noted that Zurcher had driven the tractor-trailer from CPI's Franklin facility to its Red Cloud facility many times without incident.

On appeal, the McCartneys' arguments focus generally on CPI's action in allegedly overloading the tractor-trailer on the day in question, CPI's knowledge that transporting overweight loads was dangerous, and evidence showing CPI was aware that Zurcher had hauled overweight loads many times prior to the accident. They do not point to any evidence showing CPI's actual or constructive knowledge that Zurcher was incompetent, inexperienced or reckless in the manner in which he drove the tractor-trailer while hauling CPI's corn. As noted by the district court, the record shows that Zurcher drove the route between Franklin and Red Cloud while hauling CPI's grain on many occasions without incident and ostensibly did so while overloaded on occasion. CPI did not vet or hire Zurcher, who was SKT's employee. Viewing the evidence in the light most favorable to the McCartneys, the court correctly granted summary judgment on this claim.

### (d) Negligent Hiring, Training, Retention, or Supervision

In the operative complaint, the McCartneys alleged that CPI negligently hired, trained, retained, and supervised the trucking defendants. With respect to this claim, the district court found that CPI engaged SKT as an independent contractor who was ultimately responsible for ensuring the hiring, training, and supervision of its employees. The court determined that CPI had no duty, obligation, or power to hire, train, oversee, supervise, discipline, or take any other action against Zurcher as he was not its employee, and CPI did not have a contractual relationship with him. The court also found the record did not demonstrate that CPI knew or should have known that SKT or Zurcher had an inadequate safety record or that SKT hired an unsafe driver.

An employer is subject to liability for physical harm to third persons caused by the employer's failure to exercise reasonable care in selecting an employee, even if such employee is an independent contractor. *Sparks v. M&D Trucking*, 301 Neb. 977, 921 N.W.2d 110 (2018). See Restatement (Second) of Torts § 411 at 376 (1965) (providing employer is subject to liability for physical harm to third persons caused by failure to exercise reasonable care to employ a competent and careful contractor). To impose liability upon an employer for negligently selecting or entrusting work to an employee, a plaintiff must not only show that the employer negligently selected a person incapable of performing the work but also show that the conduct of the incompetent employee was a proximate cause of injury to another. *Christianson v. Educational Serv. Unit No. 16*, 243 Neb. 553, 501 N.W.2d 281 (1993). The employee's characteristic, quality, or deficiency must proximately cause the harm producing injury to another. *Id.* In selecting an employee, an employer must exercise a degree of care commensurate with the nature and danger of the business in which the employer is engaged and the nature and grade of service for which the employee is intended, but the employer is required to hire employees possessing only such skill as is ordinarily and reasonably commensurate with the work to be performed by them. See *Strong v. K & K Investments*, 216 Neb. 370, 343 N.W.2d 912 (1984).

The record shows that both Kort and Zurcher have CDLs. There is evidence in the record that Kort provided CPI with proof of insurance and that CPI knew he had a CDL before he started hauling grain for them under the independent contractor agreement in 2015. Kort hired Zurcher in

2019. The record shows that CPI did not check either Kort's or Zurcher's driving record at any point prior to the accident. The McCartneys presented evidence at the summary judgment hearing showing that Kort had traffic citations for offenses of operating an overweight tractor-trailer in 2006, 2007, 2008, 2015, and 2016. He also had one traffic citation for operating a tractor-trailer while speeding in 2016 and one in 2017. Kort was not involved in any accidents or crashes involving a tractor-trailer prior to the accident in this case. The McCartneys presented evidence that Zurcher was involved in accidents in 2010 (his vehicle went into a ditch, and the trailer he was pulling jackknifed after he hit a cement sewer hole), 2011 (he backed into an overhead door with his tractor-trailer because the door did not fully open), and 2015 (his tractor-trailer went into the ditch after he turned the corner at a stop sign, which caused the tractor-trailer to overturn). Zurcher had traffic warnings for speeding while operating a tractor-trailer in 2017 and 2019; traffic citations for operating an overloaded tractor-trailer in 2017 and 2019; and a traffic citation for operating a tractor-trailer with "bad brakes" in 2017. The McCartneys argue this evidence shows that Zurcher and Kort were "the epitome of bad, dangerous drivers." Brief for appellants at 96.

Although CPI did not check Kort's driving record prior to employing SKT as an independent contractor, it was not Kort's driving that caused the accident in this case. As to Zurcher, the record is clear that he is an employee of SKT and not a contractor or employee of CPI. We have affirmed the district court's determination in that regard. The McCartneys do not direct us to any Nebraska case law imposing a duty on employers to determine the fitness of those employed by their independent contractors and our research reveals no Nebraska cases on point. But see *Estate of Fields by Fields v. Shaw*, 954 N.W.2d 451 (Iowa Ct. App. 2020) (declining to hold employer liable under theory of negligent hiring for harm caused by employee of its contractor). The district court did not err in granting summary judgment on this claim.

### (e) Conclusion

Considering the above analysis of the McCartneys' negligence claims against CPI and viewing the evidence in the light most favorable to the McCartneys, the district court correctly granted summary judgment in favor of CPI on the McCartneys' claims of negligence based upon the theories of vicarious liability or negligent entrustment, hiring, training, retention, or supervision. However, as to the claim involving CPI's direct negligence in the loading of the tractor-trailer, we find that a genuine issue of material fact exists such that summary judgment on this claim was in error.

### 2. SUMMARY JUDGMENT FOR KEA

The McCartneys assign that the district court erred in granting KEA's motion for summary judgment. In their amended complaint, the McCartneys alleged that KEA was negligent in (a) failing to use proper care to ensure the project was safe and did not present a hazard for traffic driving on the highway and on the Indian Creek bridge; (b) failing to use proper care to ensure its employees, workers, and others had the proper knowledge, training, experience, and education to safely operate and/or work on the project, such that it did not present a hazard for traffic; and (c) failing to otherwise exercise reasonable and proper care. We note that the McCartneys presented no evidence or argument regarding the claim in (b) above, and we need not discuss it further. As with their negligence claims against CPI, the McCartneys were required to show that KEA owed

them a legal duty, as well as a breach of that duty, causation, and resulting damages. See *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024).

### (a) Duty

The McCartneys argue that KEA (1) owed a duty to exercise reasonable care because KEA's conduct created a risk of physical harm, (2) owed a duty to exercise reasonable care because KEA was a possessor of land, and (3) owed a duty to determine whether the traffic control plan and specifications were so obviously dangerous that no competent contractor would follow them.

### *(i) Risk of Physical Harm*

The McCartneys point to *Porter v. Knife River, Inc.*, 310 Neb. 946, 970 N.W.2d 104 (2022), and they argue that "*Porter* places a duty on all contractors involved in a project such as the Indian Creek Bridge." (Emphasis omitted.) Brief for appellants at 107. In *Porter*, a police officer died of the injuries he received after his vehicle collided with a crane parked on a portion of a highway that was closed for construction. The officer maneuvered his vehicle past barricades to enter the closed roadway. He was responding to an emergency domestic violence call, and the closed roadway was the fastest route to his destination. The special administrator of his estate filed a lawsuit against multiple contractors, including the general contractor and various subcontractors, alleging negligent maintenance of a construction site. NDOT owned the construction project and developed a traffic control plan, which complied with the MUTCD. The undisputed evidence showed that all traffic control devices required by the plan were in place and operational prior to the accident. The trial court entered summary judgment in favor of the contractors.

On appeal, the Nebraska Supreme Court considered the meaning of the second and third sentences of § 39-1345, which provides as follows:

> The [NDOT] shall have the authority to close temporarily any part or all of a highway. Whenever the [NDOT] closes such highway or part thereof, the department or its contractor shall erect, at both ends of the portion of the highway so closed, suitable barricades, fences, or other enclosures and shall post signs warning the public that the highway is closed by authority of law. Such barricades, fences, enclosures, and signs shall serve as notice to the public that such highway is unsafe and that anyone entering such closed highway, without the permission or consent of the [NDOT], does so at his own peril. The [NDOT], if it deems it advisable, may permit the public use of a highway undergoing construction, repair, or maintenance in lieu of a detour route and is authorized to regulate, limit, or control traffic thereon.

(Emphasis supplied.) The Supreme Court concluded that this portion of the statute required "suitable" barricades or other traffic control devices, that the contractors' evidence showed that they exercised ordinary care, and that giving the special administrator the favorable inferences from the evidence, there was no triable issue of fact. Accordingly, the court affirmed the summary judgment granted in favor of the contractors.

We do not find *Porter* applicable to the case before us. Here, the parties responsible for traffic control were NDOT, Werner, or subcontractors other than KEA, who contracted for removing the guardrail and implementing other components of the traffic control plan. Further, the

record includes evidence of KEA's specific obligations under the Werner-KEA subcontract. The district court rejected the McCartneys' reliance on *Porter v. Knife River* to establish "some blanket overarching liability on any contractor involved in a project for any alleged act or omission related to traffic control in the event of an accident." As they did in the summary judgment proceedings, the McCartneys rely on Lauhon's analysis of the subcontract to argue that the Werner-KEA contract imposed a special duty on KEA with respect to the guardrail and traffic control on the project. The district court found Lauhon's analysis incorrect in imposing any additional duty on KEA, or any other contractor not explicitly contracted to perform traffic control or work on traffic control devices for the project. We agree. In his report, Lauhon selected portions of § 7.4 and § 7.8 of the subcontract as imposing a contractual obligation on KEA "to ensure the plans and specifications, traffic control plan, and construction work at the Bridge Project were appropriate and safe." Lauhon opined that, despite reviewing the plans, specifications, and job site, KEA failed to ensure the guardrails were appropriately removed and failed to install concrete barriers on the northeast side of the bridge once the guardrails were removed.

A review of the entire subcontract and associated documents shows that Lauhon has taken the selected portions of the subcontract referenced in his report out of context. The subcontract shows that KEA was to examine the subcontract and subcontract documents, identify the portions affecting the subcontract work, and notify Werner of deficiencies in those portions of the contractual documents before proceeding with the affected work. KEA was obliged to follow the traffic control plan, where the prime contract included a traffic control plan, which it did in this case. And, the record shows that other subcontractors were responsible for placement of guardrails, traffic control devices, and safety protection barriers, pursuant to those subcontractors' own contracts with Werner. When the Werner-KEA subcontract is construed as a whole, it is clear that KEA did not owe any contractual duty with respect to removal or placement of guardrails, traffic control devices, or safety protection barriers. See *In re Estate of Clark*, 31 Neb. App. 250, 979 N.W.2d 281 (2022) (contract must receive reasonable construction, and a court must construe it as whole and, if possible, give effect to every part of contract; whatever construction of particular clause of contract, standing alone, may be, it must be read in connection with other clauses).

*(ii) Duty as Possessor of Land*

The McCartneys argue that KEA as a contractor employed to perform work on the project was a land possessor, that KEA was on site every day, and that KEA had the authority and ability to take precautions to reduce the risk of harm to entrants on the land. They argue that KEA had an obligation to comply not only with the construction plans and specifications for the project and the traffic control plan, but also to evaluate traffic control devices for proper installation and to report any deficiencies to the NDOT or Werner. They argue that KEA's failure to report safety concerns regarding the traffic control plan created risk to entrants on the land.

A possessor of land is subject to liability for injury caused to a lawful visitor by a condition on the land if (1) the possessor either created the condition, knew of the condition, or by the existence of reasonable care would have discovered the condition; (2) the possessor should have realized the condition involved an unreasonable risk of harm to the lawful visitor; (3) the possessor should have expected that a lawful visitor such as the plaintiff either (a) would not discover or realize the danger or (b) would fail to protect himself or herself against the danger; (4) the

possessor failed to use reasonable care to protect the lawful visitor against the danger; and (5) the condition was a proximate cause of damage to the plaintiff. *Sundermann v. Hy-Vee*, 306 Neb. 749, 947 N.W.2d 492 (2020). Section 49 of the Restatement (Third) of Torts defines possessor of land as "a person who occupies the land and controls it," and the McCartneys note that "a contractor employed by the possessor to perform work on the land, whether an employee or independent contractor, is treated as a land possessor." 9 Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 49, comment *f.* at 227 (2012). We also note comment *c.* with respect to control, which provides, in part, "A person is in control of the land if that person has the authority and ability to take precautions to reduce the risk of harm to entrants on the land, which is the reason for imposing the duties contained in this Chapter on land possessors." *Id.* comment *c.*, at 225.

In granting summary judgment in favor of KEA, the district court found that the last sentence of § 39-1345 granted NDOT the exclusive responsibility for regulating, limiting, or controlling traffic on the portion of a highway open for public use while undergoing construction. The court reasoned that a contractor hired by NDOT to perform traffic control or traffic design on a project would have a clear duty to act by virtue of undertaking those obligations, unlike KEA which did not undertake that responsibility.

The district court also addressed the McCartneys' argument that pursuant to KEA's alleged duty, KEA should have recognized the lack of a guardrail as a safety issue and should have taken action. The court generally understood the McCartneys' argument to be that KEA should have informed NDOT of this safety concern and refused to work until the guardrail was reinstalled. The court noted that under this theory of duty, KEA would presumably have had the right to stop working at the site. It also noted that only NDOT would have had the authority to close the highway and bridge to public travel. The court reasoned that if KEA had stopped working and NDOT had chosen not to close the highway and bridge to the public, KEA's action in stopping work would have had no impact on the resulting accident. We agree.

### (iii) Duty With Respect to Obvious Dangers of Traffic Control Plan

Finally, the McCartneys argue that even if KEA did not prepare the plans and specifications for the project, it had a duty to third persons, including the McCartneys, to determine whether the plans and specifications were so obviously dangerous that no competent bridge subcontractor would follow them. In support of this argument, they cite *Lindsay Mfg. Co. v. Universal Sur. Co.*, 246 Neb. 495, 519 N.W.2d 530 (1994) (independent contractor owes no duty to third persons to judge plans, specifications, or instructions which he has merely contracted to follow unless they are so obviously dangerous that no competent contractor would follow them).

In their amended complaint, the McCartneys alleged that KEA failed to use proper care to ensure the project was safe and did not present a hazard for traffic driving on the highway and the bridge, but they did not allege that the plans and specifications were so obviously dangerous that no competent contractor would follow them. Their arguments on appeal appear to relate to their assertions that the guardrails along the Indian Creek bridge were removed prematurely and that concrete protection barriers should have been placed on the north side of the bridge, just as they were on the south side. Again, as noted above, KEA was not responsible for the traffic control plans and specifications, or the placement of the guardrails or barriers. There is nothing in the

record to support the McCartneys' argument that the plans and specifications were so obviously dangerous that KEA should not have followed them, as they were contractually obligated to do.

### (b) Conclusion

Because the McCartneys did not meet their burden to show that KEA owed them a legal duty, their negligence claim against KEA fails. Considering the above analysis of the McCartneys' negligence claim against KEA and viewing the evidence in the light most favorable to the McCartneys, the district court correctly granted summary judgment in favor of KEA.

### 3. EXCLUSION OF REBUTTAL WITNESS

The McCartneys assign that the district court erred in striking their rebuttal witness, Lauhon, based on an inapplicable "totality of circumstances" test.

The district court granted the trucking defendants' motion to strike Lauhon as an improper rebuttal witness, thus preventing the McCartneys' use of Lauhon as a rebuttal witness at trial. The McCartneys did not appeal from the trial verdict entered against the trucking defendants. The relevant motions concerning Lauhon for purposes of the summary judgment from which the McCartneys did appeal, i.e., KEA's motions, were simply dismissed by the court as moot given the summary judgment granted in KEA's favor.

The McCartneys also reference language concerning Lauhon's opinion used by the district court in its discussion of KEA's motion for summary judgment. In that section of its order, the court found Lauhon's opinions attempting to create a duty on the part of KEA "misguided" and "overreaching." The court clearly considered Lauhon's opinion in its analysis of the motion for summary judgment; it simply did not find his opinion adequate to create a material issue of fact with respect to whether KEA had a duty, given Lauhon's reliance on language in the Werner-KEA subcontract which he took out of context. This assignment of error fails.

### VI. CONCLUSION

As discussed above, the district court correctly granted summary judgment in favor of CPI on the McCartneys' claims of negligence based upon the theories of vicarious liability or negligent entrustment, hiring, training, retention, or supervision. The court correctly granted summary judgment in favor of KEA. And the exclusion of Lauhon as a rebuttal witness at trial against the trucking defendants is not relevant to the summary judgment proceeding during which the court did consider (and reject) his opinion. We affirm those portions of the district court's summary judgment order.

However, we find that the district court erred in granting summary judgment on the McCartneys' claim as to CPI's direct negligence in loading the tractor-trailer. Viewing the evidence in a light most favorable to the McCartneys, we cannot say as a matter of law that CPI did not have a duty to exercise reasonable care in loading the tractor-trailer or that it did not breach that duty, and we conclude that there are genuine issues of material fact with respect to whether any negligence of CPI was a contributing factor to the accident. Accordingly, we reverse the portion of the order granting summary judgment for CPI on the McCartneys' claim as to CPI's direct negligence in loading the tractor-trailer and remand the cause to the district court for further proceedings.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.